20 F.3d 398
 62 USLW 2662
 Barnett STEPAK and Roger Mondschein, derivatively and on
behalf of The Southern Company, Plaintiffs-Appellants,
v.
Edward L. ADDISON; William J. Cabaniss, Jr.; Charles H.
Chapman, Jr.; William P. Copenhaver; A.W. Dahlberg; Jack
Edwards; Joseph M. Farley; H. Allen Franklin; Arthur M.
Gignilliat, Jr.; L.G. Hardman, III; Elmer B. Harris;
Douglas L. McCrary; Earl D. McLean, Jr.; William A.
Parker, Jr.; H.G. Pattillo; William J. Rushton, III;
Robert W. Scherer; Gloria M. Shatto; Herbert Stockham;
Vince Whibbs; W.L. Westbrook and The Southern Company,
Defendants-Appellees.
 Nos. 91-8945, 92-8379.
 United States Court of Appeals,
Eleventh Circuit.
 April 15, 1994.
 
 John G. Bell, Bell & Pannell, Augusta, GA, Martin D. Chitwood, Atlanta, GA, Daniel W. Krasner, Wolf, Haldenstein, Adler, Freeman & Herz, Lawrence P. Kolker, Harvey Greenfield, New York City, for appellants in No. 91-8945.
 Wallace E. Harrell, Gilbert, Harrell, Gilbert, Sumerford & Martin, Brunswick, GA, John J. Dalton, Troutman, Sanders, Lockerman & Ashmore, James E. Joiner, Kevin C. Greene, Atlanta, GA, Robert G. Stachler, Taft, Stettinius & Hollister, G. Jack Donson, Mark G. Kobasuk, Thomas Y. Allman, Cincinnati, OH, Ralph H. Greil, Troutman, Sanders, Atlanta, GA, William O. Fifield, Sidley & Austin, Chicago, IL, for appellees in No. 91-8945 and 92-8379.
 John C. Bell, Jr., Bell & Pannell, Augusta, GA, Lawrence P. Kolker, Wolf, Haldenstein, Alder, Freeman & Herz, Daniel Krasner, Harvey Greenfield, New York City, for appellants in No. 92-8379.
 Appeals from the United States District Court for the Southern District of Georgia.
 Before BLACK and CARNES, Circuit Judges, and CLARK, Senior Circuit Judge.
 CARNES, Circuit Judge:
 
 I. INTRODUCTION
 
 1
 Appellants Barnett Stepak and Roger Mondschein are shareholders of the Southern Company ("Southern"), a major public utility holding company whose subsidiaries provide electricity to consumers in Alabama, Florida, Georgia, and Mississippi. Stepak demanded that the company bring suit to recoup losses allegedly caused by a breach of fiduciary duty by certain directors and officers of Southern and its subsidiaries. After an investigation, Southern's Board refused the demand. Stepak and Mondschein then filed this derivative suit, with Stepak alleging that the Board had wrongfully refused his demand. The district court dismissed the plaintiffs' amended complaint under Fed.R.Civ.P. 23.1 and the plaintiffs appeal.
 
 
 2
 Stepak alleges that the Board's investigation and consideration of the demand was dominated by a law firm that had represented the alleged wrongdoers in criminal proceedings involving the very subject matter of the demand. We hold that this allegation creates a reasonable doubt that the Board validly exercised its business judgment in refusing Stepak's demand, and therefore we reverse as to Stepak.
 
 
 3
 Mondschein did not make a demand on the Board and instead pleaded demand futility. The district court held that Stepak's demand mooted Mondschein's claim of demand futility, and Mondschein does not argue to the contrary on appeal. We therefore affirm as to Mondschein.
 
 II. BACKGROUND
 
 4
 By letter of July 12, 1990, Stepak demanded that Southern's Board of Directors ("the Board") bring suit to recover damages against two groups of current and former directors and officers for breach of fiduciary duty and violation of various statutes. First, Stepak alleged that after Southern's enormous investment in constructing the Alvin W. Vogtle Electric Generating Plant began to turn sour, certain named inside directors and corporate officers ("the insider defendants") embarked on a pattern of illegal activity designed to entrench themselves in power and to shield their actions from regulatory oversight. These illegal activities allegedly spurred investigations by the Justice Department, the Internal Revenue Service, the Securities and Exchange Commission, and various state agencies. Stepak alleged that in order fraudulently to reduce their tax bills, Southern and its subsidiaries, at the direction of the insider defendants, "improperly deduct[ed] as expenses many millions of dollars worth of spare parts that were required to be treated as inventory." He also alleged that the insider defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. Secs. 1961-1968 (1984 & Supp.1993), by:
 
 
 5
 conducting the Company's affairs through a pattern of racketeering activity by acts of mail and wire fraud, laundering money with the intent to evade federal income taxes and reporting requirements, using such laundered money to bribe elected officials, extorting money from Southern's employees for illegal campaign contributions, committing acts of fraud in the sale of securities, and directing acts of violence and/or threats against witnesses or informants expected to testify before the federal grand juries or communicate with law enforcement officials.
 
 
 6
 Second, Stepak also alleged that each of Southern's directors, inside and outside, from 1985 to 1988, violated section 11 of the 1933 Securities Act, 15 U.S.C.A. Sec. 77k (1981 & Supp.1993), by making material misrepresentations and omissions in SEC filings. These filings allegedly failed to disclose material facts about the problematic Vogtle project, Southern's improper accounting practices, the spare parts fraud, and the illegal political contribution schemes. These failures to disclose allegedly resulted in a class action lawsuit against Southern and in an SEC enforcement investigation.
 
 
 7
 Stepak demanded a response to his letter within twenty days. On July 27, 1990, John Dalton, an attorney with Southern's general counsel, the Atlanta law firm Troutman, Sanders, Lockerman & Ashmore ("Troutman Sanders"), replied, on behalf of the Board, that the Board would accord Stepak's demand "full and appropriate attention" but noted that twenty days was an altogether "unreasonable" time frame for the Board to conduct "a thorough review of the matters referenced in your letter." The Board scheduled a special meeting at its corporate headquarters in Atlanta for September 21, 1990, and invited Stepak's counsel to make a presentation at the special meeting.
 
 
 8
 Over the next two months, Troutman Sanders provided the Board with ten volumes of "detailed factual outlines and summaries, supporting documentation and legal analyses responsive to each specific area" raised by Stepak. The outside directors retained William Fifield of the law firm Sidley & Austin as their independent counsel. On September 21, 1990, Southern's twelve outside directors, who constitute a majority of the Board, met and heard presentations on Stepak's various allegations. These presentations were made primarily by attorneys from Troutman Sanders. Mr. Fifield also addressed the outside directors approximately halfway through the September 21 meeting. After the various presentations and a general discussion, the outside directors unanimously voted to reject Stepak's demand. On September 24, the outside directors reconvened to discuss and approve a letter drafted by Troutman Sanders rejecting Stepak's demand. Mr. Fifield was not present at the September 24 meeting.
 
 
 9
 Stepak and Mondschein filed their initial derivative complaint on April 10, 1991. The complaint asserts one claim against the insider defendants alleging a pattern of racketeering activity in violation of RICO. The complaint further asserts two claims against all of the individual defendants for breach of fiduciary duty and gross negligence in approving, ratifying, or participating in the alleged illegal activities. To establish standing to proceed derivatively, Stepak alleged that the outside directors wrongfully refused his demand. Mondschein, who had not made a demand upon the Board, alleged that demand was futile and therefore excused. On September 24, 1991, the district court dismissed the suit under Fed.R.Civ.P. 23.1 for failure to allege with particularity facts demonstrating that the outside directors' refusal of Stepak's demand was wrongful. The district court also held that Stepak's demand mooted Mondschein's claim of demand futility. The plaintiffs appealed this dismissal in case no. 91-8945. This Court remanded to allow the plaintiffs to move for relief from the judgment and for leave to replead. The district court granted the plaintiffs' motions, and vacated its earlier dismissal order.[1] The plaintiffs subsequently filed their amended complaint.[2] The defendants again moved to dismiss under Fed.R.Civ.P. 12(b)(6) and 23.1. The district court granted the motion to dismiss on March 20, 1992, and this appeal ensued.
 
 III. DISCUSSION
 
 10
 There are two issues in this appeal. First, has Stepak alleged with sufficient particularity facts that, taken as true, create a reasonable doubt either that the outside directors of Southern conducted a reasonable investigation of his allegations or that they acted in good faith in refusing his demand? Second, did Stepak's demand on the Board moot Mondschein's claim that demand was excused because futile? We review the district court's Rule 23.1 dismissals for abuse of discretion. See Rothenberg v. Security Management Co., 667 F.2d 958, 960 (11th Cir.1982); cf. Peller v. Southern Co., 911 F.2d 1532, 1536 (11th Cir.1990) (reviewing the denial of a Rule 23.1 motion to dismiss for abuse of discretion). Because Southern is a Delaware corporation, Delaware law governs the extent of the demand requirement and the circumstances under which Stepak may proceed derivatively notwithstanding the outside directors' refusal of his demand. See Kamen v. Kemper Financial Serv., Inc., 500 U.S. 90, 101-03, 111 S.Ct. 1711, 1719, 114 L.Ed.2d 152 (1991); Burks v. Lasker, 441 U.S. 471, 486, 99 S.Ct. 1831, 1841, 60 L.Ed.2d 404 (1979); cf. Peller, 911 F.2d at 1536 (accepting the parties' view that Delaware law governs issues relating to Southern).
 
 
 11
 "A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation." Aronson v. Lewis, 473 A.2d 805, 811 (Del.1984); accord Spiegel v. Buntrock, 571 A.2d 767, 772-73 (Del.1990); see 8 Del.C. Sec. 141(a) (1992). Shareholder derivative suits restrict a board of directors' managerial authority. Therefore, as a prerequisite to a shareholder derivative suit, Delaware law requires an aggrieved shareholder to demand that the board take the desired action. Spiegel, 571 A.2d at 773. The board's rejection of the shareholder's demand will not be disturbed unless it is wrongful. See id. at 775 (citing Stotland v. GAF Corp., 469 A.2d 421, 422 (Del.1983), and Zapata Corp. v. Maldonado, 430 A.2d 779, 784-86 (Del.1981)). Alternatively, a shareholder may plead that demand is excused because futile. See Levine v. Smith, 591 A.2d 194, 200 (Del.1991). The demand requirement "insure[s] that a stockholder exhausts his intracorporate remedies, and ... provide[s] a safeguard against strike suits." Aronson, 473 A.2d at 811-12. Pre-suit demand affords the board an opportunity to address the shareholder's concerns without litigation and to decide what corporate action, if any, is in the best interests of the corporation and all of its shareholders. See Spiegel, 571 A.2d at 773 (Del.1989).
 
 
 12
 In addition, Fed.R.Civ.P. 23.1 and Delaware Chancery Rule 23.1 require derivative plaintiffs to satisfy more stringent pleading requirements than the notice pleading regime of Rules 8 and 12(b)(6). Federal Rule 23.1 provides in part:
 
 
 13
 The [derivative] complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.
 
 
 14
 (The wording of Delaware Chancery Court Rule 23.1 is identical to its federal counterpart in all material respects.) The heightened pleading standard further reinforces the notion that a shareholder derivative suit is an extraordinary procedural device, "to be used only when it is clear that the corporation will not act to redress the alleged injury to itself." 7C Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure: Civil 2d Sec. 1831, at 96 (1986); see Levine, 591 A.2d at 200; Aronson, 473 A.2d at 811-12.
 
 
 15
 Stepak and Mondschein argue that Fed.R.Civ.P. 23.1 creates a federal pleading standard as to the level of particularity required to maintain a shareholder derivative suit. They argue that the federal standard is more forgiving than that applied in Delaware. The defendants deny the existence of a more lenient federal standard and argue that the district court properly looked to the degree of particularity required under Delaware law. Because we conclude that the plaintiffs have satisfied the particularity standards even as they have been enunciated by the Delaware courts, we venture no opinion as to whether "with particularity" means something less exacting in federal courts than in Delaware courts, nor do we decide whether the particularity standard is governed by state or federal law.
 
 
 16
 Stepak and Mondschein sought to guarantee their suit's survival by alleging both wrongful refusal (as to Stepak) and demand futility (as to Mondschein). We address each of these contentions separately.A. STEPAK'S CLAIM OF WRONGFUL REFUSAL
 
 
 17
 A board's affirmative decision not to pursue a shareholder's demand is an exercise of the board's managerial power. See Spiegel v. Buntrock, 571 A.2d 767, 773-74 (Del.1990). Under Delaware law, courts will respect such a refusal unless it is wrongful. Zapata Corp. v. Maldonado, 430 A.2d 779, 784 (Del.1980). A board's refusal is only wrongful if it is not a valid exercise of its business judgment. Aronson, 473 A.2d at 813. Under the business judgment rule, courts presume that business decisions are made by disinterested directors acting "on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest." Grobow v. Perot, 539 A.2d 180, 187 (Del.1988). "Unless the business judgment rule does not protect the refusal to sue, the shareholder lacks the legal managerial power to continue the derivative action, since that power is terminated by the refusal." Aronson, 473 A.2d at 813 (citing Zapata, 430 A.2d at 784). The business judgment rule thus functions "as a judicial acknowledgement of a board of directors' managerial prerogatives." Spiegel, 571 A.2d at 774. In order to survive a Rule 23.1 motion to dismiss, a shareholder must allege with particularity facts that "create a reasonable doubt that" the board's refusal was in fact made on an informed basis, in good faith, and with the corporation's best interests in mind. Levine, 591 A.2d at 211. Conclusory allegations will not satisfy the plaintiffs' burden under Rule 23.1. Starrels v. First Nat'l Bank of Chicago, 870 F.2d 1168, 1172 (7th Cir.1989); Grobow, 539 A.2d at 187. In a wrongful refusal analysis the only issues are the board's good faith and the reasonableness of the board's investigation of the shareholder's demand. Levine, 591 A.2d at 212; Spiegel, 571 A.2d at 777.
 
 
 18
 1. The Reasonableness of the Board's Investigation
 
 
 19
 Corporate directors are fiduciaries and as such owe the corporation a duty of care to inform themselves properly before making a business decision. Smith v. Van Gorkom, 488 A.2d 858, 872-73 (Del.1985) The business judgment rule has two aspects. First, we presume that corporate "directors have informed themselves 'prior to making a business decision, of all material information reasonably available to them.' " Id. at 872 (quoting Aronson, 473 A.2d at 812). Second, unless the presumption is rebutted, the directors are not personally liable for their managerial decisions. See Robert C. Clark, Corporate Law Sec. 3.4, at 123 (1986). The rule is designed "to protect and promote the full and free exercise of the managerial power granted to Delaware directors." Smith, 488 A.2d at 872 (citing Zapata, 430 A.2d at 782). To avoid application of the rule, Stepak must allege particular facts sufficient to raise a reasonable doubt that the outside directors properly informed themselves prior to rejecting his demand.
 
 
 20
 Stepak proffers a number of reasons for believing the outside directors' investigation was insufficient to render them properly informed. Only one of these theories has the potential to survive the defendants' Rule 23.1 motion. Paragraph 97 of the complaint alleges that:
 
 
 21
 [T]he Board members were merely passive recipients of the product of an "investigation" orchestrated by Southern's counsel. Moreover, Southern's counsel, the firm of Troutman, Sanders, Lockerman & Ashmore, defended Southern's officers and directors in the criminal investigations described hereinabove and therefore had an irreconciable [sic] conflict of interest in its conduct of the "investigation" purportedly undertaken by the Board.
 
 
 22
 Stepak's complaint and its attached exhibits allege that Troutman Sanders dominated the outside directors' consideration of Stepak's demand by orchestrating the investigation into Stepak's allegations and by providing legal advice concerning those allegations. The complaint and exhibits further allege that Troutman Sanders had a conflict with respect to the subject matter of the investigation. We apply Delaware law in addressing the sufficiency of these allegations. We first consider whether domination, in the manner described by the pleadings, of a board's consideration of a shareholder's derivative demand by a law firm that has represented the alleged wrongdoers in criminal proceedings involving the very subject matter of that demand, would raise a reasonable doubt that the board has properly informed itself prior to rejecting the shareholder's demand. We conclude that it would raise such a doubt. We next consider whether Stepak's complaint and its attached exhibits allege with sufficient particularity facts indicating that Troutman Sanders was such a firm and that it dominated the outside directors' consideration of Stepak's demand. We conclude that they do. We, therefore, conclude that Stepak's complaint raises a reasonable doubt that the Board acted in an informed manner in rejecting his demand.
 
 
 23
 a. Domination by a Conflicted Law Firm[3] of a
 
 
 24
 Board's Consideration of a Shareholder's Demand Would Create
 
 
 25
 a Reasonable Doubt that the Board Validly Exercised Its
 
 
 26
 Business Judgment in Rejecting the Shareholder's Demand.
 
 
 27
 It has long been debated whether it is ever appropriate for the same counsel to simultaneously represent both the corporation and the insider defendants in a shareholder derivative suit. This case does not involve simultaneous dual representation in the actual derivative lawsuit, but rather successive dual representation in the period prior to the filing of the derivative lawsuit. Nonetheless, the two situations are sufficiently analogous that an analysis of the former helps to elucidate the latter.
 
 
 28
 Although the corporate entity is a nominal defendant, it is in reality the ultimate beneficiary of any recovery against the insider defendants. E.g., Clark v. Lomas & Nettleton Financial Corp., 79 F.R.D. 658, 659-60 (N.D.Tex.1978); Messing v. FDI, Inc., 439 F.Supp. 776, 779 (D.N.J.1977). Thus, if the derivative suit is meritorious, the interests of the corporate entity and the interests of the insider defendants are likely to be directly adverse.[4] Succinctly put, the question is this: "[C]an an attorney render truly impartial advice to the corporate client where the interests of his individual clients will inevitably be affected by the character of the corporation's response to the suit?" Note, Independent Representation for Corporate Defendants in Derivative Suits, 74 Yale L.J. 524, 531 (1965); see Cannon v. U.S. Acoustics Corp., 398 F.Supp. 209, 220 (N.D.Ill.1975) (rejecting potentially conflicted counsel's offer to withdraw from representation of individual defendants but requiring the corporation to obtain independent counsel), aff'd in relevant part, 532 F.2d 1118, 1119 (7th Cir.1976) (per curiam); Lewis v. Shaffer Stores Co., 218 F.Supp. 238, 240 (S.D.N.Y.1963) (requiring corporation to obtain independent counsel when corporation's general counsel had also represented the insider defendants and when the interests of the corporation and the insiders were clearly adverse on the face of the complaint).
 
 
 29
 The same concerns enunciated by courts and commentators with respect to dual representation in the derivative lawsuit itself also arise at the demand stage, when the corporation must initially determine whether to pursue its potential claims against the alleged wrongdoers. "The initial decision then as to what role if any the corporation should take must in the first instance be made completely free from any actual or apparent conflict." Messing, 439 F.Supp. at 782. True, if the derivative suit lacks merit then the corporation's and the alleged wrongdoers' interests will be aligned; both will want the derivative suit to be terminated. However, to properly distinguish between meritorious and frivolous shareholder allegations, corporate counsel must be able to exercise independent professional judgment, free of any bias in favor of his individual clients. Note, supra, 74 Yale L.J. at 531. As the D.C. Circuit has observed in the labor union context, "counsel who are chosen by and represent [union] officers charged with misconduct, and who also represent the union, are not able to guide the litigation in the best interest of the union because of the conflict in counsel's loyalties." Milone v. English, 306 F.2d 814, 817 (D.C.Cir.1962). If the charges against the union officials "have substance[,] a sound resolution may be prevented by the very fact of dual representation [of the union and the alleged wrongdoer officers] during the process leading to a [union] decision with respect to the charges." Id. In Murphy v. Washington Am. League Base Ball Club, Inc., 324 F.2d 394, 398 (D.C.Cir.1963), the D.C. Circuit indicated that the concerns voiced in Milone are equally applicable in the shareholder derivative context. We agree.
 
 
 30
 In another union derivative suit, Yablonski v. United Mine Workers, the D.C. Circuit held that " '[w]here, as here, union officials are charged with breach of fiduciary duty, the [union] is entitled to an evaluation and representation of its institutional interests by independent counsel, unencumbered by potentially conflicting obligations to any defendant officer.' " 454 F.2d 1036, 1041 (D.C.Cir.1971) (quoting International Brotherhood of Teamsters v. Hoffa, 242 F.Supp. 246, 256 (D.D.C.1965)) (emphasis added). The Yablonski court rejected the argument that dual representation was permissible because the union's institutional interests were aligned with those of the defendant officers, reasoning that, "[t]hat approach puts the cart before the horse." Id. The same is true in the shareholder derivative context; only after a reasonable and impartial investigation can a board of directors determine, consistent with its fiduciary duties, where the corporation's interests lie. When a board chooses to delegate its investigatory duties, it must do so reasonably. See 8 Del.C. Sec. 141(e).
 
 
 31
 We take it as axiomatic that a board would not be acting consistently with its fiduciary duties were it to reject a shareholder demand based on an investigation and presentation by the alleged wrongdoers. See, e.g., Smith v. Van Gorkom, 488 A.2d 858, 874 (Del.1985). Likewise, when a board chooses to entrust its investigation to a law firm--and it is unquestionably the board's prerogative to do so--the directors must ensure that counsel is capable of independently evaluating the corporation's interests. Selection of a law firm that has actually represented the alleged wrongdoers in proceedings related to the very subject matter that the law firm is now asked to neutrally investigate reaches, in our opinion, the level of gross negligence and is incompatible with a board's fiduciary duty to inform itself "of all material information reasonably available" prior to making a business decision. Smith v. Van Gorkom, 488 A.2d 858, 872 (Del.1985). Such a shortcoming strips a board's rejection of a shareholder demand of the protection of the business judgment rule.
 
 
 32
 A law firm's representation of the alleged wrongdoers in criminal investigations is clearly incompatible with its simultaneous handling of a reasonable and neutral investigation of their conduct on behalf of the corporation. However, dual representation of the corporation and the alleged wrongdoers is also problematic when the two representations are undertaken successively instead of simultaneously. In either case:
 
 
 33
 counsel might have had to assert positions antagonistic to those dutifully urged or to be urged in defense of the individual officers. Conversely, counsel might have been deterred from aggressively representing the interests of the [union] and its members because of a lingering allegiance to these officers.
 
 
 34
 Weaver v. United Mine Workers, 492 F.2d 580, 584 (D.C.Cir.1973) (labor union derivative suit) (emphasis added). There is a strong possibility that a "lingering allegiance" toward the insider defendants will color or otherwise bias counsel's investigation of the allegations against its former clients, as well as any legal advice counsel provides to the corporation about the matter. This is especially true when the prior representation was in relation to criminal proceedings. The risk of spill-over loyalties is especially high in this context: counsel, who until recently advocated the position of the alleged wrongdoers, is now asked to investigate their conduct objectively and impartially and to advise an alleged victim whether it should seek to recover from them. That asks too much of human nature, given that a fair and thorough review might lead the corporation to sue the former clients. We believe that it is unreasonable for a board of directors to entrust its investigation of a shareholder's demand to conflicted counsel.
 
 
 35
 In addition to the problem of lingering and divided loyalties, a law firm that had previously defended the alleged wrongdoers would be hampered in its investigation of the shareholder's allegations by its continuing duty to preserve the secrets and confidences of its former clients. Absent consent, the Code of Professional Responsibility bars a lawyer from revealing a confidence or secret of his client.[5] See Ga.Code of Professional Responsibility DR 4-101(B). Although "confidences" as used in the Code refers solely to communications protected by the attorney-client privilege, id. DR 4-101(A), "secrets" is a broader concept and covers all "other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." Id. (emphasis added). The lawyer should not accept employment that "might require such disclosure." Id. EC 4-5. A lawyer's ethical obligation of confidentiality continues even after the termination of the lawyer-client relationship, id. EC 4-6, and includes an obligation to exercise care "to prevent the disclosure of the confidences and secrets of one client to another." Id. EC 4-5.
 
 
 36
 The lawyer's ethical duty of confidentiality is much broader than the scope of the attorney-client evidentiary privilege. Brennan's Inc. v. Brennan's Restaurants, Inc., 590 F.2d 168, 172 (5th Cir.1979). As a result, a law firm that had previously represented an alleged wrongdoer would be obligated not to reveal any non-public information, from whatever source derived, obtained in the course of the prior representation. By definition, the duty protects information acquired by means other than privileged communications with the client. Therefore, much of the protected information might have been uncovered by an investigation conducted by truly independent counsel on behalf of the corporation. But counsel who has previously represented the alleged wrongdoers in connection with the very conduct in question, and who is thereby burdened with a confidentiality duty to them, is not truly independent. It would be unrealistic to expect a lawyer or law firm to unlearn that which it had already learned about a case and then to reinvestigate, rediscover, and relearn that same information, all without betraying the interests of either the former or the present client. So long as it is assumed that the conflicted law firm would observe its ethical obligation of confidentiality in the conduct of its investigation, a board's selection of that firm as the primary investigator is tantamount to a decision to forego "material information reasonably available." Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984). Only if the board were entitled to assume that the conflicted law firm would violate its duty to its former clients might it be reasonable to give that firm control over the investigation; even so, the problem of divided and lingering loyalties remains unmitigated. We conclude that it would be unreasonable and, in fact, grossly negligent, for a board of directors to assume or expect a law firm to violate such a well established ethical obligation. Selection of such a firm to conduct a board's investigation turns a blind eye to material information that would otherwise be available to the board, and therefore falls short of the standards that shareholders have a right to expect from the board.
 
 
 37
 Our analysis is not a novel approach; corporate boards frequently employ independent counsel in similar circumstances. In this very case, the outside directors retained Mr. Fifield of the Sidley & Austin law firm as independent counsel in response to the Stepak demand letter. That action evidences the outside directors' recognition that they could not rely upon the conflicted law firm of Troutman Sanders in regard to the demand. The problem, at least as alleged, is that the outside directors' use of Mr. Fifield was not co-extensive with the need for independent counsel. Instead, they relied heavily upon Troutman Sanders. See infra, at 409-10.
 
 
 38
 In sum, if a shareholder pleads with sufficient particularity facts that, taken as true, show that a board's consideration of his demand was dominated by a law firm that represents or previously represented an alleged wrongdoer in criminal proceedings related to the very subject matter of the demand, then the shareholder raises a reasonable doubt that the board's rejection of his demand was an informed decision protected by the business judgment rule. In such a case, the shareholder's complaint is entitled, on a wrongful refusal theory, to survive a Rule 23.1 motion to dismiss.
 
 
 39
 Having concluded that such a conflict can, when properly pleaded, establish that a board's refusal was wrongful and, consequently, that a shareholder may properly prosecute a derivative action on the corporation's behalf, we must now examine Stepak's complaint and its attached exhibits to determine whether this particular plaintiff has satisfied the Rule 23.1 particularity requirements. We determine first whether he has pleaded with particularity that Troutman Sanders dominated the outside directors' consideration of the demand, and second, whether he has pleaded with particularity that Troutman Sanders was a conflicted law firm.
 
 
 40
 b. Stepak Has Alleged with Particularity that Troutman
 
 
 41
 Sanders Dominated the Outside Directors'
 
 
 42
 Consideration of His Demand.
 
 
 43
 The following discussion is based on the well-pleaded factual allegations of Stepak's complaint and its attached exhibits which, for present purposes, we are required to take as true. Grobow v. Perot, 539 A.2d 180, 187 (Del.1988).
 
 
 44
 At the time Stepak's demand was received, considered, and rejected by the outside directors, Southern had no in-house legal staff. Instead, Troutman Sanders served as Southern's general counsel. Although the outside directors retained Mr. Fifield of Sidley & Austin as independent counsel at sometime prior to their September 21 meeting, Troutman Sanders handled the directors' correspondence with Stepak and his attorney, and conducted the actual investigation into Stepak's allegations. The outside directors first met to consider Stepak's demand on September 21, 1990. In preparation for this meeting, Troutman Sanders prepared and furnished the outside directors with ten volumes of "detailed factual ... and legal analyses responsive to each area discussed in Stepak's letter." Because Stepak attached the minutes of the September 21 and 24, 1990, meetings to his complaint, they are incorporated into his pleading, Fed.R.Civ.P. 10(c), and must be considered in evaluating the defendants' Rule 23.1 motion to dismiss. See Levine v. Smith, 591 A.2d 194, 214 (Del.1991). The minutes were prepared by Troutman Sanders and reviewed by both that firm and by Mr. Fifield, the outside directors' independent counsel. Therefore, information in the minutes relating to Troutman Sanders' and Mr. Fifield's presence and participation at the meetings must be taken at face value and any ambiguities should be construed against Troutman Sanders and Mr. Fifield, who prepared and reviewed the minutes, and against their clients, whose minutes these are. The minutes of the September 21 and 24 board meetings reveal that Troutman Sanders dominated the presentation of facts to the outside directors, as they are alleged to have dominated the investigation itself. The minutes also demonstrate that Troutman Sanders provided the outside directors with legal advice concerning Stepak's allegations and the outside directors' potential responses.
 
 
 45
 Six Troutman Sanders attorneys were present at the September 21 meeting. Mr. Dalton of Troutman Sanders opened the meeting with a discussion of:
 
 
 46
 the legal standards applicable to the board's consideration of the demand. He reviewed the previous consideration by the board and its committees of the issues raised by Mr. Stepak's demand. He discussed factual data, outlines and summaries, supporting documentation and legal analyses which addressed all issues raised by Mr. Stepak's demand relating to: (1) the Company's accounting for power plant spare parts; (2) the disclosures in the Company's dividend reinvestment and stock purchase plan securities filings; (3) Gulf Power Company political contributions; and (4) witness intimidation and retaliation allegations.
 
 
 47
 Minutes of September 21, 1990, Meeting, at 1-2. Discussion and questions followed. Stepak's counsel then entered the meeting, addressed the outside directors, and left. Next, a second Troutman Sanders attorney presented a report concerning the spare parts accounting issue which was followed by questions and discussion. Then, a third Troutman Sanders attorney addressed the alleged securities violations and more questions and discussion followed this presentation.
 
 
 48
 The Troutman Sanders attorneys left the meeting just before lunch and the outside directors' independent counsel, Mr. Fifield, addressed the outside directors for the one and only time. After lunch the six Troutman Sanders attorneys re-entered the meeting. A lawyer from the firm Beggs & Lane gave a presentation on the political contributions issue.[6] The directors also heard from insider defendants Addison and McCrary and from a representative of the Arthur Andersen accounting firm on the political contributions issue. A Troutman Sanders attorney and the Beggs & Lane lawyer then reported on the witness intimidation allegations. Their report was followed by questions and discussion of a general nature. Troutman Sanders attorneys were present during the deliberation and vote. The outside directors deliberated and voted unanimously not to pursue Stepak's allegations. They then instructed Mr. Dalton of Troutman Sanders to draft a letter informing Stepak of their decision.
 
 
 49
 The outside directors reconvened on September 24, 1990, to review Mr. Dalton's draft refusal letter. Mr. Fifield was not present at this meeting despite the fact that further, possibly substantive, "discussion and questions" took place. Mr. Dalton, a Troutman Sanders attorney, was present and involved in the continued discussions. The outside directors instructed him to dispatch the refusal letter to Stepak.
 
 
 50
 Stepak has alleged that Troutman Sanders dominated the investigation and presentation, and participated in the advisory process. We conclude that Stepak has alleged with sufficient particularity that Troutman Sanders dominated the outside directors' consideration of his demand. We turn now to the question of whether he has alleged with sufficient particularity that Troutman Sanders was a conflicted law firm with respect to his demand.
 
 
 51
 c. Stepak Has Alleged with Particularity that Troutman
 
 
 52
 Sanders Was a Conflicted Law Firm with Respect to
 
 
 53
 the Subject Matter of Stepak's Demand.
 
 
 54
 Rule 23.1 requires a derivative plaintiff to allege particularized facts, not bare legal conclusions. Grobow v. Perot, 539 A.2d 180, 187 (Del.1988). Thus, an allegation simply that Troutman Sanders was a conflicted law firm would not satisfy Rule 23.1. Instead, Stepak must allege specific facts which, if true, would establish why Troutman Sanders was conflicted. In paragraph 97 of the complaint, Stepak alleges that Troutman Sanders "defended Southern's officers and directors in the criminal investigations described hereinabove...." Paragraph 97 alleges two specific facts: (1) that Troutman Sanders had defended some of Southern's officers and directors in criminal investigations;[7] and (2) that those criminal investigations concerned conduct involved in Stepak's demand. If true, these factual allegations establish that the outside directors were grossly negligent in confiding the conduct of their investigation to Troutman Sanders, and raise a reasonable doubt that the outside directors acted in an informed manner in rejecting Stepak's demand. The particularity requirement has been met.
 
 
 55
 The defendants vigorously contest Stepak's assertion that Troutman Sanders represented the directors and officers in the criminal investigations. The defendants' contention, although relevant to the ultimate outcome of the litigation, is not relevant to this appeal which involves only the pleadings. Nothing in the complaint or its attached exhibits suggests that Troutman Sanders did not represent some of the directors or officers. The allegations are that Troutman Sanders did. On remand, in order to prove those allegations, Stepak will have to establish that Troutman Sanders did in fact represent some of the directors and officers in criminal investigations involving the same subject matter as the demand. Nothing in this opinion precludes the defendants from moving for summary judgment at a later date, after Stepak has been afforded a reasonable opportunity for discovery, should such proof be lacking.
 
 
 56
 d. No Corrective Steps Appear in the Pleading Record
 
 Sufficient to Remove the Taint of Troutman
 
 57
 Sanders' Alleged Conflict.
 
 
 58
 The defendants argue that the presentation by Mr. Fifield, the outside directors' independent counsel, was sufficient to remove any taint associated with Troutman Sanders' involvement. We disagree. The pleading record, which includes the minutes of the critical meetings, supports Stepak's view that Troutman Sanders not only did virtually all the investigating, but also did the lion's share of the presenting, and a significant part of the advising, at the September 21 meeting. The firm coordinated the meeting and six of its lawyers were present at all times, except when Mr. Fifield addressed the outside directors, which he did only once. Troutman Sanders lawyers addressed the outside directors both before and after Mr. Fifield. Compared to Mr. Fifield, the Troutman Sanders lawyers had the first and the last word. Further, Mr. Fifield played no investigative role but instead limited his contribution to legal advice. Thus, to the extent that Troutman Sanders' alleged conflict affected its investigation and presentation of the facts, as opposed to its legal analyses, Mr. Fifield's presentation could not have remedied the effects of the conflict. Mr. Fifield was not even present at the September 24 meeting, even though "discussion and questions followed" Mr. Dalton's presentation of his draft rejection of Stepak's demand. Whatever cleansing effect Mr. Fifield's lone presentation on September 21 might have had, it was overwhelmed by the omnipresence of the Troutman Sanders' attorneys.
 
 
 59
 At oral argument, Mr. Fifield conceded that it is reasonable to infer that Troutman Sanders had a conflict of interest from the fact that he was retained by the outside directors. Nonetheless, in his argument to this Court, Mr. Fifield tried to de-emphasize the impact of Troutman Sanders' conflict by describing the outside directors' investigation, and their September 21 meeting, as "an adversarial process." The gist of that argument is that because the outside directors heard from a number of different sources, including Stepak's counsel, all views were adequately presented and the outside directors served, much like a jury, as an impartial trier of fact. The major problem with this argument is that the outside directors, like a jury, controlled neither which facts they heard nor the legal guidance given them to put the evidence into the proper context. In a jury trial, the role of informational gatekeeper and legal adviser is played by an impartial judge. In this case, that role was played by a conflicted law firm. Just as a biased judge would eviscerate the adversary system's value as a dispute resolution mechanism, a conflicted law firm can eviscerate the decisional process of a corporate board.
 
 
 60
 Counsel's adversarial process analogy proves too much, for it concedes that Troutman Sanders' presentation of facts and legal advice was designed to show the insufficiency of the "adversary's" point of view. To describe the complaining shareholder as the adversary of corporate counsel, whose mission is to assist in the corporation's pursuit of its best interests, is to treat the shareholder as the corporation's enemy. The fallacy of labelling an aggrieved shareholder as a corporate adversary should be immediately apparent. When the shareholder's allegations are meritorious, the shareholder renders a service to the corporation by bringing those allegations to the board's attention. Furthermore, Delaware law imposes an affirmative duty upon a board to conduct a reasonable investigation. Cf. Levine v. Smith, 591 A.2d 194, 213 (Del.1991) (stating that once demand is made and refused by the board in good faith, "the only issue remaining ... is the reasonableness of [the] Board's investigation of [the] demand"). The directors shirk this duty when they rely on a shareholder to present the case for corporate action while assigning in advance to corporate counsel the task of demonstrating that action is not warranted. An adversarial approach is all the more problematic because the shareholder is not normally entitled to discovery at the demand stage. The deck will be heavily stacked in corporate counsel's favor; corporate counsel will have access to confidential exculpatory material within the corporation's possession whereas the shareholder will be unable to obtain confidential inculpatory material. Corporate counsel's superior access should be used to marshal for the board all reasonably available material facts; it should not be used to rig the outcome of the inquiry. Far from remedying the problem of conflicted corporate counsel, an adversarial approach to the investigation and evaluation of a shareholder demand, at least as it allegedly occurred in this case, is in and of itself incompatible with the directors' fiduciary obligations and strips any resultant decision of the protection of the business judgment rule.
 
 
 61
 e. Conclusion.
 
 
 62
 Standing alone, the role that Troutman Sanders is alleged to have played in the outside directors' consideration of Stepak's demand would not raise a reasonable doubt that rejection of Stepak's demand was a valid exercise of their business judgment. Delaware law fully protects corporate directors who rely on the services and advice of professionals reasonably believed to be competent. See 8 Del.C. Sec. 141(e). However, Stepak also alleges that Troutman Sanders defended Southern's officers and directors in criminal investigations arising out of activities covered by his demand. This is an allegation of specific fact, not a conclusory assertion, and we consider it as true for purposes of this appeal. Grobow v. Perot, 539 A.2d 180, 187 (Del.1988). Taken together, these allegations raise a reasonable doubt about the reasonableness of the outside directors' efforts to inform themselves prior to rejecting Stepak's demand. If, as alleged, Southern's outside directors relied on a conflicted law firm to investigate the demand and present the facts to them, then the outside directors acted unreasonably and failed to take necessary steps to inform themselves of " 'all material information reasonably available to them.' " Smith v. Van Gorkom, 488 A.2d 858, 872 (Del.1985) (quoting Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984)).
 
 
 63
 The problem in this case is not the amount of time or the quantity of ink expended by or on behalf of the outside directors in preparation for the September 21 and 24 meetings. The Delaware Supreme Court has stated on numerous occasions that there is no pre-set formula that corporate boards must follow to be considered properly informed. See, e.g., Levine v. Smith, 591 A.2d 194, 214 (Del.1991). A board is entitled to wide latitude in the conduct of its investigation; however, even the most generous and forgiving standard has its limits or it is no standard at all. The Delaware Supreme Court has set the boundary at gross negligence. See Smith v. Van Gorkom, 488 A.2d 858, 873 (Del.1985); Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984). Control over the flow of information to a decision maker yields substantial control over the ultimate decision. The ability of the investigator to exercise its mission competently and impartially is central to the investigation's effectiveness in informing the directors. It is unreasonable to trust a conflicted law firm to present the relevant information and to do so in a neutral manner. If Stepak's allegations are true, Southern's outside directors acted in a unreasonable manner by entrusting the investigation of Stepak's demand to Troutman Sanders; the outside directors were grossly negligent.
 
 
 64
 Our holding is a limited one. We do not mean to imply that the outside directors either could not have or should not have heard from Troutman Sanders. As counsel for the defendants observed at oral argument, the outside directors might have been grossly negligent to ignore that which Troutman Sanders knew or might have known, assuming the firm was free to convey that information. However, there is a significant difference between hearing from Troutman Sanders as part of the investigation and having the firm conduct the investigation.
 
 2. The Board's Good Faith
 
 65
 Stepak also argues that the outside directors' rejection of his demand was not made in good faith. According to Stepak, Southern's directors and officers' liability insurance contains an insured versus insured exclusion. Such an exclusion denies insurance coverage when the corporation (or a director, officer, or corporate affiliate) sues an officer or director, even in a derivative context. The exclusion does not apply when a shareholder sues an officer or director. Stepak alleges that counsel informed the outside directors that a rejection of the demand would leave intact a $140 million insurance umbrella whereas acceptance of the demand would expose the directors to personal liability. Stepak's allegation boils down to a claim that the outside directors, most of whom are named as defendants, rejected his demand, not because it was in the corporation's best interests, but to protect their own wealth. Stepak essentially seeks a per se rule that corporate directors can never be trusted to exercise proper business judgment when their personal assets are on the line. However logical this proposition, absent the "rare case[ ]" and "egregious" circumstances, it is not the law in Delaware. See, e.g., Aronson, 473 A.2d at 815 ("However, the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors...."); Decker v. Clausen, Del.Ch. (Nos. 10,684 & 10,685, Nov. 6, 1989), 15 Del.J.Corp.L. 1022, 1028 (1990) (stating that an allegation of insured v. insured liability exclusion is but a variation on the directors suing themselves refrain).
 
 
 66
 Stepak attempts to distinguish the Delaware precedents by alleging not merely the existence of the insurance exclusion but also that it was expressly brought to the outside directors' attention during their deliberations. It would be a strange rule indeed that held that a company may have this type of insurance policy but that the directors, who have the responsibility for governing the corporation, must not know about it. The directors are under a fiduciary duty to keep themselves apprised of corporate affairs. See, e.g., Francis v. United Jersey Bank, 87 N.J. 15, 432 A.2d 814 (1981) (requiring directors to keep informed of and to monitor corporate affairs and activities); Robert C. Clark, Corporate Law Sec. 3.4.1, at 125-26 & n. 9 (1986). Stepak's argument would lead to the perverse result that the business judgment rule would protect the outside directors' refusal of his demand so long as they failed to inform themselves of a fact, but would deny such protection if the directors fully informed themselves. We therefore reject Stepak's argument that knowledge of an insured v. insured exclusion presents the "egregious" circumstances necessary to defeat application of the business judgment rule. In view of the case law and the record we are unable to say that the district court abused its discretion.
 
 B. MONDSCHEIN'S CLAIM OF DEMAND FUTILITY
 
 67
 Unlike Stepak, Mondschein did not make a demand upon the Board. Instead, Mondschein alleged that demand was futile and therefore excused. The district court rejected this argument and held that under Spiegel v. Buntrock, 571 A.2d 767 (Del.1990), and Stotland v. GAF Corp., 469 A.2d 421 (Del.1983), Stepak's demand precluded any Southern stockholder from prosecuting a demand other excused derivative suit based on the claims covered by the Stepak demand letter. The district court is not alone in its analysis. See Boeing Co. v. Shrontz, Del.Ch. (Civ. A. No. 11,273, April 20, 1992), 18 Del.J.Corp.L. 225, 237 (1993) (holding that plaintiffs cannot "cover all the bases" by having one shareholder make a demand and another allege demand futility; Spiegel requires shareholders to choose "either to make demand or attempt to establish demand futility"). On appeal, Mondschein does not address the district court's holding that his claim of demand futility is mooted by Stepak's demand; the issue is therefore waived. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1113 n. 1 (11th Cir.1993); Rogero v. Noone, 704 F.2d 518, 520 n. 1 (11th Cir.1983). Because Mondschein has waived the demand futility issue and did not make a demand upon the Board, he has no standing to serve as a derivative plaintiff. The district court's order of dismissal is therefore affirmed with regard to Mondschein.
 
 IV. CONCLUSION
 
 68
 We AFFIRM the district court order insofar as it dismisses the complaint with respect to Mondschein, but we REVERSE the order insofar as it dismisses the complaint with respect to Stepak, and we REMAND for further proceedings consistent with this opinion.
 
 
 
 [1]
 Although this Court retained jurisdiction when it remanded in case no. 91-8945, the district court's vacation of its initial order of dismissal moots the appeal in no. 91-8945
 
 
 [2]
 The amended complaint differs from the original complaint only in the addition of one paragraph, which alleges that the outside directors acted in bad faith because they were aware that acceptance of Stepak's demand would result in the loss of their liability insurance coverage. See infra, at 411. References to the complaint apply to both the original and amended complaints unless otherwise noted
 
 
 [3]
 Throughout this opinion we do not use the term "conflicted law firm" to refer solely to a firm having a conflict of interest that would necessarily require disqualification under rules of legal ethics. We use the term in a broader sense to designate any law firm that undertakes to provide legal services, whether investigatory or advisory, to a corporation in connection with a shareholder derivative demand, after having represented an alleged wrongdoer in a criminal investigation involving subject matter that overlaps with that of the demand
 
 
 [4]
 Such will not always be the case. It may be that successful prosecution of the suit against the wrongdoers would expose the corporation itself to liabilities or other negative consequences that would far outweigh any possible recovery from the wrongdoers. See In re Consumers Power Co. Derivative Litig., 132 F.R.D. 455, 485-86 (E.D.Mich.1990). In such a case, both the corporation and the insider defendants would have an interest in seeing the derivative suit dismissed, although obviously for different reasons
 
 
 [5]
 Southern is headquartered in Atlanta, Georgia, and Troutman Sanders is an Atlanta-based firm. We therefore assume for the sake of this analysis that the Georgia Code of Professional Responsibility applies. However, these same basic standards of ethical conduct are demanded of counsel in every state. See, e.g., Del.Rules of Professional Conduct, Rule 1.6 & cmt. p 5, Rule 1.9
 
 
 [6]
 Other than Mr. Fifield and Stepak's counsel, the Beggs & Lane lawyer was the only non-Troutman Sanders attorney to address the outside directors. The record does not indicate whom Beggs & Lane represented, nor has that firm entered an appearance in this appeal. The defendants do not argue that Beggs & Lane was independent or that its presence in any way mitigated Troutman Sanders' domination of the meeting
 
 
 [7]
 It is unclear whether Stepak is alleging that, at the time it conducted the outside directors' investigation into his demand, Troutman Sanders currently represented Southern's officers and directors or instead that the firm had previously represented them. Clearly it would have been unreasonable for the outside directors to ask Troutman Sanders to present a neutral evaluation of the demand were Troutman Sanders simultaneously representing the very people whose actions it was to investigate. However, because of the particularity requirement of Rule 23.1, we construe the allegation narrowly, as claiming only that Troutman Sanders had previously represented officers and directors of Southern, and that Troutman Sanders was asked to investigate Stepak's demand after its representation of those officers and directors had ended