**C.L. GRIMES, Plaintiff Below, Appellant,**

v.

**James L. DONALD, Clement M. Brown, Jr., Frank J. Cummiskey, Raymond J. Dempsey, John Fairclough, James L. Fischer, Robert S. Folsom, James P. Leake, James M. Nolan, and Jim A. Watson, Defendants Below, Appellees,**

and

**DSC Communications Corporation, Nominal Defendant Below, Appellee.**

No. 791995.

Supreme Court of Delaware.

Submitted: Jan. 25, 1996.
Decided: April 11, 1996.

Clark W. Furlow (argued), of Smith, Katzenstein & Furlow, Wilmington, and Thaddeus Holt (argued), Point Clear, Alabama, for Appellant C.L. Grimes.

Robert K. Payson and Stephen C. Norman of Potter, Anderson & Corroon, Wilmington; Samara L. Kline (argued), of Baker & Botts, Dallas, TX, for appellee James L. Donald.

Thomas R. Hunt, Jr., Michael L. Vild, and Thomas C. Grimm of Morris, Nichols, Arsht & Tunnell, Wilmington, Chester A. Hinshaw (argued), of Jones, Day, Reavis & Pogue, Dallas, TX, for Appellees Clement M. Brown, Frank J. Cummiskey, Raymond J. Dempsey, John Fairclough, James L. Fischer, Robert S. Folsom, James P. Leake, James M. Nolan and Jim A. Watson.

Stephen E. Jenkins of Ashby & Geddes, Wilmington, for Appellee DSC Communications Corporation.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT and BERGER, JJ. (constituting the Court en Banc).

VEASEY, Chief Justice:

In this appeal we address the following issues: (1) the distinction between a direct claim of a stockholder and a derivative claim; (2) a direct claim of alleged abdication by a board of directors of its statutory duty; (3) when a pre-suit demand in a derivative suit is required or excused; and (4) the consequences of demand by a stockholder and the refusal by the board to act on such a demand.

We hold that the Court of Chancery correctly dismissed this stockholder action for the failure to state a claim upon which relief can be granted where the plaintiff stockholder: (a) asserted a direct claim that the directors abdicated their statutory duty to manage or direct the management of the business and affairs of the corporation by entering various employment contracts (the "Agreements") with the chief executive officer ("CEO") providing that the CEO "shall be responsible for the general management of the affairs of the company" and further providing that the CEO can declare a constructive termination of the Employment Agreement for "unreasonable interference" by the Board with the CEO; (b) made a pre-suit demand on the Board to abrogate the Agreements, the demand was refused, and the stockholder thereafter sought to assert other legal theories relating to the Agreements, arguing that demand was excused.

We hold as follows: First, an abdication claim can be stated by a stockholder as a direct claim, as distinct from a derivative claim, but here the complaint fails to state a claim upon which relief can be granted. Second, when a stockholder demands that the board of directors take action on a claim allegedly belonging to the corporation and demand is refused, the stockholder may not thereafter assert that demand is excused with respect to other legal theories in support of the same claim, although the stockholder may have a remedy for wrongful refusal or may submit further demands which are not repetitious.

Accordingly, on the state of this record, we **AFFIRM** the dismissal of this action by the Court of Chancery.

## I. The Facts

C.L. Grimes ("Grimes"), plaintiff below-appellant, appeals from the dismissal, for failure to state a claim, of his complaint against James L. Donald ("Donald") (the CEO) and the Board of Directors (the "Board") of DSC Communications Corporation ("DSC" or the "Company"). Grimes seeks a declaration of the invalidity of the Agreements between Donald and the Company. He also seeks an award of damages against Donald and other members of the Board. He alleges that the Board has breached its fiduciary duties by abdicating its authority, failing to exercise due care and committing waste.

The following facts have been drawn from the face of the complaint. The Company is a Delaware corporation headquartered in Plano, Texas, a suburb of Dallas. The Company, whose shares are traded on the Nasdaq National Market System, designs, manufactures, markets and services telecommunication systems.

The Agreements, executed during 1990, are the focus of the complaint. The Employment Agreement provides that Donald "shall be responsible for the general management of the affairs of the company . . . ," and that Donald "shall report to the Board." The

Employment Agreement runs until the earlier of Donald's 75th birthday or his termination (1) by reason of death or disability; (2) for cause; or (3) without cause. Under the Employment Agreement, Donald can declare a "Constructive Termination Without Cause" by the Company of his employment as a result of, *inter alia,* "unreasonable interference, in the good-faith judgment of ... [Donald], by the Board or a substantial stockholder of the Company, in [Donald's] carrying out his duties and responsibilities under the [Employment] Agreement." A Constructive Termination Without Cause takes effect after delivery of notice by Donald and the failure by the Board to remedy such interference.

In the event of a Termination Without Cause, constructive or otherwise, Donald is entitled to the following:

1. Continued payment of his "Base Salary" at the level in effect immediately prior to termination for the remainder of his "Term of Employment," which, as stated, will be 6½ years unless Donald dies or turns 75 first. In 1992, Donald's Base Salary exceeded $650,-000.

2. Annual incentive awards for the remainder of the Term of Employment equal to the average of the three highest annual bonuses awarded to Donald during his last ten years as CEO. In 1992, such award allegedly equaled $300,000.

3. Medical benefits for Donald and his wife for life, as well as his children until the age of 23.

4. Continued participation in all employee benefit plans in which Donald is participating on the date of termination until the earlier of the expiration of the Term of Employment or the date on which he receives equivalent benefits from a subsequent employer.

5. Other (unidentified) benefits in accordance with DSC's plans and programs. *See* Am.Cplt.Ex. 1 § 11(d).

*Grimes v. Donald,* Del.Ch., 20 Del.J.Corp.L. 757, 765, 1995 WL 54441 (1995).

The Income Continuation Plan provides, *inter alia,* that after Base Salary payments cease under the Employment Agreement, Donald is entitled to receive, for the remainder of his life, annual payments equal to the average of the sum of his Base Salary plus bonuses in the three highest years, multiplied by 3%, multiplied by his years of service. Donald has also been awarded 200,000 "units" under the Long Term Incentive Plan. In the event of a Change of Control, as defined in the Incentive Plan, Donald will have the right to cash payments for his units, which Grimes alleges could total $60,000,000 at the stock price in effect at the time the complaint was filed.

As required by Court of Chancery Rule 23.1, Grimes alleges in his complaint that he wrote to the Board on September 23, 1993 and demanded that the Board abrogate the Agreements. The demand letter states, in part:

Paragraph 2(c) of the Employment Agreement dated as of January 1, 1990, between the Company and Mr. Donald purports to vest in Mr. Donald "the general management of the affairs of the Company." Under Paragraph 1(f)(vii) of the Employment Agreement, Mr. Donald is deemed to have been constructively terminated without cause, if there is "unreasonable interference, in the good-faith judgment of [Mr. Donald], by the Board or a substantial stockholder of the Company, in [Mr. Donald's] carrying out his duties and responsibilities under the Agreement."

Paragraph 1(f)(vii), therefore, purports to put Mr. Donald in a position unilaterally to declare a "constructive termination without cause" whenever he declares that the Board has "unreasonably interfered" with his general management of the affairs of the Company. Other provisions, including, without limitation, Paragraphs 11(d) and 27 of the Employment Agreement and Paragraph 4(b) of the DSC Communications Corporation Executive Income Continuation Plan dated as of January 1, 1990, between the Company and Mr. Donald, would impose drastic costs and burdens on the Company in the event of such a "constructive termination without cause."

The effect of the cited provision is to delegate the duties and responsibilities of the Board of Directors to Mr. Donald. This delegation is contrary to law and inconsistent with the certificate of incorporation and bylaws of the Company.

\* \* \* \* \* \*

The cited provisions of the Employment Agreement are therefore void as a matter of law. Although they are void, they should be abrogated so as to leave no cloud upon the lawful conduct of the Company's affairs. And it should go without saying that the Board must refrain from conducting the business of the Company as if they were valid.

\* \* \* \* \* \*

Accordingly, I hereby demand that the Board of Directors take immediate steps to abrogate Paragraphs 1(f)(vii) and 2(c) of the Employment Agreement dated as of January 1, 1990, between the Company and James L. Donald, and the 1990 Long–Term Incentive Compensation Plan insofar as it applies to Mr. Donald.

The Board refused the demand in a letter dated November 8, 1993, which states in part:

The Compensation Committee of our Board of Directors, as well as the entire Board, have seriously considered the issues set forth in your letter of September 29. To assist in the review, the Board obtained reports analyzing the relevant issues from the Company's outside benefits consultant, Hirschfeld, Stern, Moyer & Ross, Inc. and from the Company's outside legal counsel, Jones, Day, Reavis & Pogue. The Compensation Committee and the full Board of Directors believe that a thorough analysis of the applicable provisions of Delaware law necessarily leads to a conclusion that Mr. Donald's duties as described in the Employment Agreement do not constitute an impermissible delegation of the duties of the Board of Directors.

\* \* \* \* \* \*

Accordingly, the provisions relating to the Board's actions set forth in Sections 11(d) and 1(f)(vii) of the Employment Agreement simply relate to the consequences of the Board's unreasonable interference with Mr. Donald's properly delegated duties. These provisions do not limit the Board's right to guide the Company through the formulation of policy or its right to take any other action it desires to take. They simply represent the agreement between the Company and Mr. Donald regarding the circumstances that will create a constructive termination of his employment and the consequences of such an event.

Based on the foregoing, the Board has concluded that the description of Mr. Donald's duties in the Employment Agreement do not constitute an impermissible delegation of the duties of the Board of Directors. Consequently, the Board declines to take any action to abrogate any provision of the Employment Agreement or the 1990 Long–Term Incentive Compensation Plan as you have requested.

## II. Grimes Has Not Stated a Claim for Abdication of Directorial Duty.

Despite the fact that Grimes demanded that the Board abrogate the Agreements and his demand was refused, the Court of Chancery declined to review the Board's decision to refuse the demand under the business judgment rule, stating:

Whether these contracts do violate Section 141 is a question of law directly concerning the legal character of the contract and its effect upon the directors. The question whether these contracts are valid or not does not fall into the realm of business judgment; it cannot be definitively determined by the informed, good faith judgment of the board. It must be determined by the court.

*Grimes,* 20 Del.J.Corp.L. at 771 (citing *Blasius Indus., Inc. v. Atlas Corp.,* Del.Ch., 564 A.2d 651, 663 (1988), which involved a direct action against the board of directors). We agree that the Court of Chancery appropriately analyzed the abdication claim as a direct—as distinct from a derivative—claim.

Courts have long recognized that the same set of facts can give rise both to a direct claim and a derivative claim. *Bennett v. Breuil Petroleum Corp.,* Del.Ch., 99 A.2d

236, 241 (1953); *Borak v. J.I. Case Co.*, 7th Cir., 317 F.2d 838, 844–45 (1963), *aff'd*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). The due care, waste and excessive compensation claims asserted here are derivative and will be considered as such. *Kramer v. Western Pacific Indus., Inc.*, Del.Supr., 546 A.2d 348, 353 (1988). The abdication claim, however, is a direct claim. In order to reach this conclusion, we believe a further exploration of the distinction between direct and derivative claims is appropriate.

### A. Distinction Between Direct and Derivative Claims, Generally

■ As the Court of Chancery has noted: "Although the tests have been articulated many times, it is often difficult to distinguish between a derivative and an individual action." *In re Rexene Corp. Shareholders Litig.*, Del.Ch., 17 Del.J.Corp.L. 342, 348, 1991 WL 77529 (1991); *see also Abelow v. Symonds*, Del.Ch., 156 A.2d 416, 420 (1959) ("line of distinction ... is often a narrow one ..."). The distinction depends upon " 'the nature of the wrong alleged' and the relief, if any, which could result if plaintiff were to prevail." *Kramer v. Western Pacific*, 546 A.2d at 352 (quoting *Elster v. American Airlines, Inc.*, Del.Ch., 100 A.2d 219, 221–223 (1953)). To pursue a direct action, the stockholder-plaintiff "must allege more than an injury resulting from a wrong to the corporation." *Id.* at 351. The plaintiff must state a claim for " 'an injury which is separate and distinct from that suffered by other shareholders,' ... or a wrong involving a contractual right of a shareholder ... which exists independently of any right of the corporation." *Moran v. Household Int'l, Inc.*, Del. Ch., 490 A.2d 1059, 1070, *aff'd*, Del.Supr., 500 A.2d 1346 (1985) (quoting 12B Fletcher Cyclopedia Corps., § 5291 (Perm.Ed.1984)).

The American Law Institute ("ALI") *Principles of Corporate Governance: Analysis and Recommendations* (1992) ("*Principles* ") is helpful in this instance. Section 7.01 of the *Principles* undertakes to state the common law with respect to the distinction between direct and derivative actions. *Id.* § 7.01, cmt. a. The Comment also discusses a situation relevant to the case *sub judice:*

In some instances, actions that essentially involve the structural relationship of the shareholder to the corporation ... may also give rise to a derivative action when the corporation suffers or is threatened with a loss. One example would be a case in which a corporate official knowingly acts in a manner that the certificate of incorporation [or the Delaware General Corporation Law] denied the official authority to do, thereby violating both specific restraints imposed by the shareholders [or the GCL] and the official's duty of care.

*Id.*, cmt. c. The Comment further notes that, "courts have been more prepared to permit the plaintiff to characterize the action as direct when the plaintiff is seeking only injunctive or prospective relief." *Id.*, cmt. d.

With respect to the abdication claim, Grimes seeks only a declaration of the invalidity of the Agreements. Monetary recovery will not accrue to the corporation as a result. Chancellor Seitz illustrated this distinction in *Bennett.* The Court of Chancery there allowed the plaintiff-stockholder to proceed individually on his claim that stock was issued for an improper purpose and entrenchment; he proceeded derivatively on his claim that the stock was issued for an insufficient price. 99 A.2d at 241.

### B. Applicable Pleading Standards

■ Since the abdication claim is direct, not derivative, a motion to dismiss such a claim pursuant to Chancery Rule 12(b)(6) implicates the pleading standard of Chancery Rule 8(a). *Solomon v. Pathe Communications Corp.*, Del.Supr., 672 A.2d 35, 39 (1996). Neither the pleading standard of Chancery Rule 9(b) ("circumstances constituting fraud or mistake shall be stated with particularity") nor that of Chancery Rule 23.1 which requires, with respect to derivative claims, that a plaintiff plead "with particularity the efforts, if any ... to obtain the action the plaintiff desires ... and the reasons for the ... failure to obtain the action or for not making the effort," is implicated. Chancery Rule 8(a), which is implicated here, requires only "a short and plain statement of the claim." In considering a motion to dismiss for failure to state a direct claim, the Court of Chancery assumes the truth of well-plead-

ed allegations, giving to the plaintiff "the benefit of all reasonable inferences that can be drawn from ... [the] pleading." *In re USA Cafes, L.P. Litig.*, Del.Ch., 600 A.2d 43, 47 (1991); *see also In re Santa Fe Pacific Corp. Shareholder Litig.*, Del.Supr., 669 A.2d 59, 65–66 (1995). Conclusory statements without supporting factual averments will not be accepted as true for purposes of a motion to dismiss. *In re Tri–Star Pictures, Inc. Litig.*, Del.Supr., 634 A.2d 319, 326 (1995). We review *de novo* the decision by the Court of Chancery on a motion to dismiss a direct claim, applying the same legal standard. *Solomon v. Pathe Communications Corp.*, 672 A.2d at 39.

## C. Analysis of Grimes' Abdication Claim

■ In the case before us, the abdication claim fails as a matter of law. Grimes claims that the potentially severe financial penalties which the Company would incur in the event that the Board attempts to interfere in Donald's management of the Company will inhibit and deter the Board from exercising its duties under Section 141(a).[1] The Court of Chancery assumed that, if a contract could have the practical effect of preventing a board from exercising its duties, it would amount to a *de facto* abdication of directorial authority.[2] The Chancellor concluded, however, that Grimes has not set forth well-pleaded allegations which would establish such a situation. We agree.

Putting aside the payments which would result from a change of control, Grimes has pleaded, at most, that Donald would be entitled to $20 million in the event of a Constructive Termination. The Chancellor found, in light of the financial size of DSC reflected in the exhibits to the complaint, that this amount would not constitute a *de facto* abdi-

cation. Grimes contends, however, that the payments could amount to a *de facto* abdication in possible future circumstances. Such a set of facts has not been pleaded, is not before this Court, is based on speculation, and is not ripe for adjudication.[3]

Directors may not delegate duties which lie "at the heart of the management of the corporation." *Chapin v. Benwood*, Del.Ch., 402 A.2d 1205, 1210 (1979), *aff'd sub nom. Harrison v. Chapin*, Del.Supr., 415 A.2d 1068 (1980). A court "cannot give legal sanction to agreements which have the effect of removing from directors in a very substantial way their duty to use their own best judgment on management matters." *Abercrombie v. Davies*, Del.Ch., 123 A.2d 893, 899 (1956), *rev'd on other grounds*, Del.Supr., 130 A.2d 338 (1957). Distinguishing these cases, however, the Court of Chancery stated: "[U]nlike the agreements considered in *Abercrombie* and *Chapin*, the Donald Agreements do not formally preclude the DSC board from exercising its statutory powers and fulfilling its fiduciary duty." *Grimes*, 20 Del. J.Corp.L. at 774–775. *Compare Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 943–44 (1985) (delegation to independent appraiser of responsibility to value oil and gas reserves as part of a merger agreement was proper exercise of business judgment).

With certain exceptions, "an informed decision to delegate a task is as much an exercise of business judgment as any other." *Rosenblatt*, 493 A.2d at 943. Likewise, business decisions are not an abdication of directorial authority merely because they limit a board's freedom of future action. A board which has decided to manufacture bricks has less freedom to decide to make bottles. In a world of scarcity, a decision to do one thing will com-

---

**1.** Section 141(a) provides that: "The business and affairs of every corporation ... shall be managed by or under the direction of a board of directors...." 8 *Del.C.* § 141(a).

**2.** The cases cited by Grimes involve *formal* abdication by a board of directors. *See Chapin v. Benwood Foundation, Inc.*, Del.Ch., 402 A.2d 1205 (1979) (trustees agreed to appoint particular person to future vacancy on board); *Abercrombie v. Davies*, Del.Ch., 123 A.2d 893 (1956), *rev'd on other grounds*, Del.Supr., 130 A.2d 338

(1957) (directors agreed to vote unanimously or submit to outside arbitrator).

**3.** The Chancellor perceptively notes that "[a]n even more difficult case would be presented where the terms of a CEO's employment contract came to have the practical effect of precluding the board from exercising its statutory powers and satisfying its fiduciary duty, but that effect was not reasonably foreseeable at the time the contract rights were negotiated at arm's-length." *Grimes*, 20 Del.J.Corp.L. at 775 n. 8.

mit a board to a certain course of action and make it costly and difficult (indeed, sometimes impossible) to change course and do another. This is an inevitable fact of life and is not an abdication of directorial duty.

If the market for senior management, in the business judgment of a board, demands significant severance packages, boards will inevitably limit their future range of action by entering into employment agreements. Large severance payments will deter boards, to some extent, from dismissing senior officers. If an independent and informed board, acting in good faith, determines that the services of a particular individual warrant large amounts of money, whether in the form of current salary or severance provisions, the board has made a business judgment. That judgment normally will receive the protection of the business judgment rule unless the facts show that such amounts, compared with the services to be received in exchange, constitute waste or could not otherwise be the product of a valid exercise of business judgment. *See, e.g., Saxe v. Brady,* Del.Ch., 184 A.2d 602, 610 (1962).

The Board of DSC retains the ultimate freedom to direct the strategy and affairs of the Company. If Donald disagrees with the Board, the Company may or may not (depending on the circumstances) be required to pay him a substantial sum of money in order to pursue its chosen course of action. So far, we have only a rather unusual contract, but not a case of abdication.[4] The Chancellor correctly dismissed the abdication claim.

### III. Grimes' Demand on The Board With Respect to The Derivative Claim Conceded That Demand Was Required.

The complaint alleges that Grimes made a pre-suit demand on the Board in the Sep-

tember 29, 1993, letter quoted above. In summary, the letter described the relevant provisions of the Donald Agreements and demanded that the Board "take immediate steps to abrogate" the cited sections of the Agreements. The Court of Chancery held that, by "making demand upon the board, plaintiff has in effect conceded that the board was in a position to consider and act upon his demand." *Grimes,* 20 Del. J.Corp.L. at 772 (citing *Spiegel v. Buntrock,* Del.Supr., 571 A.2d 767, 775 (1990)). Contending that demand was excused, Grimes later filed suit alleging waste, excessive compensation and due care claims arising out of the Agreements. But the Chancellor held that Grimes waived his right to argue that demand was excused with respect to these claims because he had already made demand that the agreements be abrogated as unlawful. *Id.* We agree.

### A. The Demand Requirement in Perspective

Because the prolix (43 page) complaint tends to confuse the issues in this case, it is appropriate to restate, as a matter of background, the Delaware jurisprudence relating to stockholder derivative litigation.

If a claim belongs to the corporation, it is the corporation, acting through its board of directors, which must make the decision whether or not to assert the claim. "[T]he derivative action impinges on the managerial freedom of directors." *Pogostin v. Rice,* Del. Supr., 480 A.2d 619, 624 (1984). "[T]he demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of the corporation." *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984).

---

**4.** The unfortunate choice of language in the Employment Agreement should not obscure the fact that, in many cases, large severance payments do not necessarily preclude a formerly passive board from asserting its power over a CEO. The Court of Chancery, in dismissing the claim, nonetheless disparaged as "foolish" and "ill-conceived" the language of the agreement introducing the concept of the Board committing "unreasonable interference" in the discharge of Donald's duties, "in the good faith judgment of the Executive...." 20 Del.J.Corp.L. at 777.

We agree that, on the surface, this unfortunate choice of words is "badly flawed" in terms of traditional concepts of corporate governance. *Id.* When the Employment Agreement is read as a whole, however, the initial perception of unlawful delegation gives way to the reality that the Agreement is not—on its face—a wrongful delegation. This poor choice of language in the Agreements is not actionable *per se.* What actually may happen in the future may or may not ever become a litigable issue that is ripe for adjudication.

A stockholder filing a derivative suit must allege either that the board rejected his pre-suit demand that the board assert the corporation's claim or allege with particularity why the stockholder was justified in not having made the effort to obtain board action. This is a "basic principle of corporate governance" and is a matter of substantive law embodied in the procedural requirements of Chancery Rule 23.1.[5]

One ground for alleging with particularity that demand would be futile is that a "reasonable doubt" exists that the board is capable of making an independent decision to assert the claim if demand were made.[6] The basis for claiming excusal would normally be that: (1) a majority of the board has a material financial or familial interest;[7] (2) a majority of the board is incapable of acting independently for some other reason such as · domination or control;[8] or (3) the underlying transaction is not the product of a valid exercise of business judgment.[9] If the stockholder cannot plead such assertions consistent with Chancery Rule 11,[10] after using the "tools at hand"[11] to obtain the necessary information before filing a derivative action, then the stockholder must make a pre-suit demand on the board.

The demand requirement serves a salutary purpose. First, by requiring exhaustion of intracorporate remedies, the demand requirement invokes a species of alternative dispute resolution procedure which might avoid litigation altogether.[12] Second, if litigation is beneficial, the corporation can control the proceedings. Third, if demand is excused or wrongfully refused, the stockholder will normally control the proceedings.[13]

---

**5.** *Kamen v. Kemper Fin. Svcs., Inc.*, 500 U.S. 90, 101, 111 S.Ct. 1711, 1719, 114 L.Ed.2d 152 (1991); *see also* Fed.R.Civ.P. 23.1.

**6.** *Aronson*, 473 A.2d at 814.

**7.** *Id.* at 815.

**8.** *Rales v. Blasband*, Del.Supr., 634 A.2d 927, 936 (1993). Demand is not excused simply because plaintiff has chosen to sue all directors. *Id.* Likewise, a plaintiff cannot necessarily disqualify all directors simply by attacking a transaction in which all participated. *Pogostin v. Rice*, 480 A.2d at 627. To hold otherwise would permit plaintiffs to subvert the particularity requirements of Rule 23.1 simply by designating all the directors as targets.

**9.** *Aronson*, 473 A.2d at 814.

**10.** Rule 11 mandates that by signing a pleading, the attorney certifies "that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances ... the allegations and other factual contentions have evidentiary support, or if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; ..." Ct. Ch.R. 11(b)(3).

**11.** In *Rales* we undertook to describe some of those "tools at hand":

Although derivative plaintiffs may believe it is difficult to meet the particularization requirement of *Aronson* because they are not entitled to discovery to assist their compliance with Rule 23.1, *see Levine,* 591 A.2d at 208–10, they have many avenues available to obtain information bearing on the subject of their claims. For example, there is a variety of public sources from which the details of a corporate act may be discovered, including the media and governmental agencies such as the Securities and Exchange Commission. In addition, a stockholder who has met the procedural requirements and has shown a specific proper purpose may use the summary procedure embodied in 8 *Del.C.* § 220 to investigate the possibility of corporate wrongdoing. *Compaq Computer Corp. v. Horton,* Del.Supr., 631 A.2d 1 (1993).... Surprisingly, little use has been made of section 220 as an information-gathering tool in the derivative context. Perhaps the problem arises in some cases out of an unseemly race to the court house, chiefly generated by the "first to file" custom seemingly permitting the winner of the race to be named lead counsel. The result has been a plethora of superficial complaints that could not be sustained. Nothing requires the Court of Chancery, or any other court having appropriate jurisdiction, to countenance this process by penalizing diligent counsel who has employed these methods, including section 220, in a deliberate and thorough manner in preparing a complaint that meets the demand excused test of *Aronson.*
634 A.2d at 934–935 n. 10.

**12.** *Aronson*, 473 A.2d at 811–812; *Cramer v. General Tel. & Elecs. Corp.*, 3d Cir., 582 F.2d 259, 275 (1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979).

**13.** This Court has held that in demand-excused cases the board of directors may sometimes reassert its authority over a derivative claim in certain instances through the device of the Special Litigation Committee ("SLC"). *Zapata Corp. v.*

The jurisprudence of *Aronson* and its progeny is designed to create a balanced environment which will: (1) on the one hand, deter costly, baseless suits by creating a screening mechanism to eliminate claims where there is only a suspicion expressed solely in conclusory terms;[14] and (2) on the other hand, permit suit by a stockholder who is able to articulate particularized facts showing that there is a reasonable doubt either that (a) a majority of the board is independent for purposes of responding to the demand, or (b) the underlying transaction is protected by the business judgment rule.[15]

■ *Aronson* introduced the term "reasonable doubt" into corporate derivative jurisprudence. Some courts and commentators have questioned why a concept normally present in criminal prosecution would find its way into derivative litigation.[16] Yet the term is apt and achieves the proper balance. Reasonable doubt can be said to mean that there is a reason to doubt.[17] This concept is sufficiently flexible and workable to provide the stockholder with "the keys to the courthouse"[18] in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms.

## B. Wrongful Refusal Distinguished from Excusal

■ Demand has been excused in many cases in Delaware under the *Aronson* test.[19] The law regarding wrongful refusal is

*Maldonado,* Del.Supr., 430 A.2d 779 (1981). The use of a committee of the board formed to respond to a demand or to advise the board on its duty in responding to a demand is not the same as the SLC process contemplated by *Zapata,* however. It is important that these discrete and quite different processes not be confused.

14. Block, Radin & Maimone, *Derivative Litigation: Current Law Versus The American Law Institute,* 48 Bus.Law. 1443, 1454 (1993); Dooley & Veasey, *The Role of the Board in Derivative Litigation,* 44 Bus.Law. 503, 539 (1989). Such a concern is not of recent vintage. *See* Note, *Extortionate Corporate Litigation: The Strike Suit,* 34 Colum.L.Rev. 1308 (1934). While the Delaware approach differs from that developed in Part VII of the American Law Institute's Principles of Corporate Governance, many of the goals are the same: "The end result should be that the board's or committee's determinations serve as a vehicle by which an early screening of the action's probable merit and its likely impact upon the corporation is achieved." PRINCIPLES OF CORP. GOVERNANCE: ANALYSIS AND RECOMMENDATIONS, Part VII, Ch. 1, Introductory Notes, at 9 (1992); *see also* MODEL BUSINESS CORP. ACT § 7.42 (1991).

15. Such a test implicates a determination by the Court of Chancery which involves "essentially a discretionary ruling on a predominately factual issue." *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 186 (1988). Judging whether demand is excused "is inescapably a question of judgment...." *Harris v. Carter,* Del.Ch., 582 A.2d 222, 229 (1990). The exercise of discretion by experienced and capable judges is a satisfactory screening mechanism, in our view.

16. *See* Coffee, *New Myths and Old Realities: The American Law Institute Faces the Derivative Action,* 48 Bus.Law. 1407, 1413 (1993); *Starrels v. First Nat'l Bank of Chicago,* 7th Cir., 870 F.2d 1168, 1174 (1989) (Easterbrook, J., concurring). Some have contended that the Delaware jurisprudence has erected unfortunate barriers to derivative litigation. *See* Coffee, 48 Bus.Law. at 1411. *See also* Seligman, *The New Corporate Law,* 59 Brook.L.Rev. 1, 27 (1993); Gevurtz, *Who Represents the Corporation? In Search of a Better Method for Determining the Corporate Interest in Derivative Suits,* 46 U.Pitt.L.Rev. 265, 285 (1985). We disagree. *See Rales,* 634 A.2d at 934; *see also* Moore, *Shareholder Rights Still Alive and Well in Delaware: The Derivative Suit: A Death Greatly Exaggerated,* 38 St. Louis L.J. 947 (1994). Professor Coffee admits the possibility that: "Arguably, the open-textured latitude inherent in *Aronson*'s test may be its saving grace." 48 Bus.Law. at 1413.

17. Stated obversely, the concept of reasonable doubt is akin to the concept that the stockholder has a "reasonable belief" that the board lacks independence or that the transaction was not protected by the business judgment rule. The concept of reasonable belief is an objective test and is found in various corporate contexts. *See* 8 *Del. C.* § 145(a) & (b). *Cf.* THE MODEL BUSINESS CORP. ACT § 8.30. *See also* ALI, PRINCIPLES OF CORP. GOVERNANCE § 4.01(a). *Compare* Veasey & Manning, *Codified Standard—Safe Harbor or Uncharted Reef,* 35 Bus.Law. 919 (1980), *with* Arsht & Hinsey, *Codified Standard—Safe Harbor but Chartered Channel,* 35 Bus.Law. No. 4, ix (1980).

18. *See* Dooley & Veasey, 44 Bus.Law. at 504.

19. Some of the relatively recent cases include the following: *Heineman v. Datapoint Corp.,* Del. Supr., 611 A.2d 950 (1992); *Harris v. Carter,* Del.Ch., 582 A.2d 222 (1990); *Friedman v. Beningson,* Del.Ch., C.A. No. 12232, 1995 WL 716762, Allen C. (Dec. 4, 1995); *Good v. Texaco, Inc.,* Del.Ch., 9 Del.J.Corp.L. 461, 1984 WL 8220 (1984); *Kells–Murphy v. McNiff,* C.A. No. 11009,

not as well developed, however.[20]  Although Delaware law does not require demand in every case [21] because Delaware does have the mechanism of demand excusal, it is important that the demand process be meaningful. Therefore, a stockholder who makes a demand is entitled to know promptly what action the board has taken in response to the demand.  A stockholder who makes a serious demand and receives only a peremptory refusal has the right to use the "tools at hand" to obtain the relevant corporate records, such as reports or minutes, reflecting the corporate action and related information in order to determine whether or not there is a basis to assert that demand was wrongfully refused.[22]  In no event may a corporation assume a position of neutrality and take no position in response to the demand.  *Kaplan v. Peat, Marwick, Mitchell & Co.*, Del.Supr., 540 A.2d 726 (1988).

■■■■■  If a demand is made, the stockholder has spent one—but only one—"arrow" in the "quiver."  The spent "arrow" is the

1991 WL 137143, Jacobs, V.C. (July 12, 1991); *Seibert v. Harper & Row Publishers, Inc.*, Del.Ch., 10 Del.J.Corp.L. 645, 1984 WL 21874 (1984); *Edelman v. Phillips Petroleum Co.*, Del.Ch., 10 Del.J.Corp.L. 835, 1985 WL 11534 (1985); *Moran v. Household Int'l, Inc.*, Del.Ch., 490 A.2d 1059, *aff'd on other grounds*, Del.Supr., 500 A.2d 1346 (1985); *L.A. Partners, L.P. v. Allegis Corp.*, Del.Ch., [1987–1988 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 93,505 at 97,247, 1987 WL 14531 (1987); *In re Chrysler Corp. Shareholders Litig.*, Del.Ch., [1992 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,505, 1992 WL 181024, (1992); *Chrysogelos v. London*, Del.Ch., C.A. No. 11910, 1992 WL 58516, Jacobs, V.C. (Mar. 25, 1992); *Abajian v. Kennedy*, Del.Ch., 18 Del.J.Corp.L. 179, 1992 WL 8794 (1992); *Strougo v. Carroll*, Del.Ch., 17 Del.J.Corp.L. 352, 1991 WL 9978 (1991); *In re NVF Co. Litig.*, Del.Ch., 16 Del.J.Corp.L. 361, 1989 WL 146237 (1989); *Manchester v. Narragansett Capital, Inc.*, Del.Ch., C.A. No. 10822, 1989 WL 125190 (Oct. 18, 1989); *Siegman v. Tri–Star Pictures, Inc.*, Del.Ch., 15 Del.J.Corp.L. 218, 1989 WL 48746 (1989), *aff'd and rev'd on other grounds sub nom., In re Tri–Star Pictures, Inc. Litig.*, Del.Supr., 634 A.2d 319 (1993); *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, Del.Ch., Fed.Sec.L.Rep. (CCH) ¶ 93,331, 1987 WL 15254 (July 20, 1987); *Tomczak v. Morton Thiokol, Inc.*, Del.Ch., 12 Del.J.Corp.L. 381, 1986 WL 5481 (1986); *Lewis v. Hett*, Del.Ch., 10 Del.J.Corp.L. 240 (1984) (waste); *Stein v. Orloff*, Del.Ch., 11 Del.J.Corp.L. 312, 1985 WL 11561 (1985) (waste); *Avacus Partners, L.P. v. Brian*, Del.Ch., [1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,232, 1990 WL 161909 (Oct. 24, 1990); *Andreae v. Andreae*, Del.Ch., 18 Del.J.Corp.L. 197, 1992 WL 43924 (1992); *Rosan v. Chicago Milwaukee Corp.*, Del.Ch., 16 Del.J.Corp.L. 378, 1990 WL 13482 (1990); *Lewis v. Aronson*, Del.Ch., 11 Del.J.Corp.L. 243, 1985 WL 11553 (1985); *Katell v. Morgan Stanley Group, Inc.*, Del.Ch., [1992–1993 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,437, 1993 WL 10871 (1993); *Steiner v. Meyerson*, [1995 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,857, 1995 WL 441999 (1995); *Kahn v. Tremont Corp.*, Del.Ch., C.A. No. 12339, 1994 WL 162613, Allen, C. (April 21, 1994); *Yaw v. Talley*, Del.Ch., 20 Del.J.Corp.L. 454, 1994 WL 89019 (1994); *Leslie v. Telephonics Office Tech.*,

*Inc.*, Del.Ch., 19 Del.J.Corp.L. 1237, 1993 WL 547188 (1993); *Kahn v. Roberts*, Del.Ch., [1993–1994 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,201, 1994 WL 70118 (1994); *Emerald Partners v. Berlin*, Del.Ch., 19 Del.J.Corp.L. 1182, 1993 WL 545409 (1993); *Rothenberg v. Santa Fe Pacific Corp.*, Del.Ch., C.A. No. 11749, 1995 WL 523599, Jacobs, V.C. (Sept. 5, 1995).

**20.**  *See, e.g., Levine v. Smith*, Del.Supr., 591 A.2d 194 (1991); *Allison v. General Motors Corp.*, D.Del., 604 F.Supp. 1106 (1985); *Levit v. Shrontz*, Del.Ch., C.A. No. 11273, 1994 WL 30542, Berger, V.C. (Jan. 19, 1994); *Mount Moriah Cemetery v. Moritz*, Del.Ch., Fed.Sec.L.Rep. (CCH) ¶ 95,900, 1991 WL 50149 (April 4, 1991); *Stepak v. Addison*, 11th Cir., 20 F.3d 398 (1994). *See also* Coffee, 48 Bus.Law. 1407.

**21.**  The ALI *Principles* and the American Bar Association's *Model Business Corporation Act* § 7.42(1), both are premised upon the concept of universal demand—that is, a requirement that demand must be made in every case. The *Principles* and the *Model Act* then go in directions which are different from Delaware law and different from each other in determining the manner in which derivative litigation is to be conducted or terminated after demand has been made.  In reversing the decision of the United States Court of Appeals for the Seventh Circuit, which had adopted the universal demand rule in a derivative suit under the Investment Company Act of 1940, the Supreme Court of the United States held that state law applied and analyzed the implications of the universal demand rule compared with the traditional rule exemplified by Delaware law. *Kamen v. Kemper Fin. Svcs., Inc.*, 500 U.S. 90, 101–08, 111 S.Ct. 1711, 1719–23, 114 L.Ed.2d 152 (1991).

**22.**  *See* note 11, *supra*.  Normally, however, the discovery procedures of Chancery Rules 26–37 are not available to a stockholder to uncover the basis for a claim not yet stated with particularity. *Levine*, 591 A.2d at 209.  For a view to the contrary, see Note, *Discovery in Federal Demand–Refused Litigation*, 105 Harv.L.Rev. 1025 (1992).

right to claim that demand is excused.[23] The stockholder does not, by making demand, waive the right to claim that demand has been wrongfully refused.[24]

Simply because the composition of the board provides no basis *ex ante* for the stockholder to claim with particularity and consistently with Rule 11 that it is reasonable to doubt that a majority of the board is either interested or not independent, it does not necessarily follow *ex post* that the board in fact **acted** independently, disinterestedly or with due care in response to the demand. A board or a committee of the board may **appear** to be independent, but may not always **act** independently.[25] If a demand is made and rejected, the board rejecting the demand is entitled to the presumption of the business judgment rule unless the stockholder can allege facts with particularity creating a reasonable doubt that the board is entitled to the benefit of the presumption.[26] If there is reason to doubt [27] that the board acted independently or with due care in responding to the demand, the stockholder may have the basis *ex post* to claim wrongful refusal. The stockholder then has the right to bring the underlying action with the same standing which the stockholder would have had, *ex ante*, if demand had been excused as futile. *See Stepak v. Addison,* 11th Cir., 20 F.3d 398 (1994).

### C. Application to This Case

In the case before the Court, plaintiff made a pre-suit demand.[28] Later, however, plaintiff contended that demand was excused. Under the doctrine articulated by this Court in *Spiegel v. Buntrock,*[29] plaintiff,

by making a demand, waived his right to contest the independence of the board. As the Court of Chancery properly held, plaintiff may not bifurcate his theories relating to the same claim. Thus, demand having been made as to the propriety of the Agreements, it cannot be excused as to the claim that the Agreements constituted waste, excessive compensation or was the product of a lack of due care.

The Court of Chancery implicitly applied a test analogous to *res judicata* to determine whether Grimes' demand letter conceded that demand was required for all legal theories arising out of the set of facts described in the demand letter. We believe this to be a correct approach. The alternative claims raised in the complaint fit squarely within the same transactional rubric as the demand since all of the claims, however denominated, arise out of the Agreements. As the Court of Chancery stated: "There is little to recommend a process in which a shareholder seeks board consideration of only some aspects of a transaction or puts forward only selected theories for board consideration, while reserving other theories for judicial consideration. Such a process would be neither efficient nor fair." *Grimes,* 20 Del.J.Corp.L. at 772.

The same concerns are expressed in the *Restatement (Second) of Judgments,* which asserts that "fairness to the defendant, and sound judicial administration, require that at some point litigation over the particular controversy come to an end." RESTATEMENT (SECOND) OF JUDGMENTS § 19, cmt. a. (1980). Since the making of a pre-suit demand con-

---

**23.** *Spiegel,* 571 A.2d 767; *accord* Demott, SHAREHOLDER DERIVATIVE ACTIONS LAW AND PRACTICE § 5:11.

**24.** *Levine,* 591 A.2d at 210; *Allison,* 604 F.Supp. at 1121.

**25.** *See Kahn v. Lynch Communication Sys.,* Del. Supr., 638 A.2d 1110, 1120–21 (1994) (*"Kahn I"*) ("independent committee" of the board did not act independently when it succumbed to threat of controlling stockholder, thus invoking entire fairness analysis rather than business judgment rule).

**26.** *Levine,* 591 A.2d at 212; *Allison,* 604 F.Supp. at 1121. For an analysis, generally, of the nature of the business judgment rule presumption and the manner in which it may be overcome, *see*

*Cinerama, Inc. v. Technicolor, Inc.,* Del.Supr., 663 A.2d 1156, 1162 (1995); 1 Balotti & Finkelstein, THE DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 4.6 at 4–43 to 4–67 (1996 Supp.).

**27.** This may be clear on the face of the refusal or may be developed through the tools at hand. *See* note 11 *supra. See also Thorpe v. CERBCO, Inc.,* Del.Ch., 611 A.2d 5, 11 (1991).

**28.** Plaintiff also used the 8 *Del.C.* § 220 procedure.

**29.** 571 A.2d 767.

cedes that demand is required, the concession should apply "to all or any part of the transaction, or series of connected transactions, out of which the action [demand] arose." *Id.* § 24; *see Foltz v. Pullman, Inc.,* Del.Super., 319 A.2d 38, 40 (1974).

In *Spiegel,* this Court held that "[a] shareholder who makes a demand can no longer argue that demand is excused." 571 A.2d at 775. Permitting a stockholder to demand action involving only one theory or remedy and to argue later that demand is excused as to other legal theories or remedies arising out of the same set of circumstances as set forth in the demand letter would create an undue risk of harassment.

In this case, the Board of DSC considered and rejected the demand. After investing the time and resources to consider and decide whether or not to take action in response to the demand, the Board is entitled to have its decision analyzed under the business judgment rule unless the presumption of that rule can be rebutted. *Spiegel,* 571 A.2d at 776. Grimes cannot avoid this result by holding back or bifurcating legal theories based on precisely the same set of facts alleged in the demand.

Since Grimes made a pre-suit demand with respect to all claims arising out of the Agreements, he was required by Chancery Rule 23.1 to plead with particularity why the Board's refusal to act on the derivative claims was wrongful. *Levine v. Smith,* 591 A.2d at 211. The complaint recites the Board's rejection of Grimes' demand and proceeds to assert why Grimes disagrees with the Board's conclusion. The complaint generally asserts that the refusal could not have been the result of an adequate, good faith investigation since the Board decided not to act on the demand. Such conclusory, *ipse dixit,* assertions are inconsistent with the requirements of Chancery Rule 23.1. *See Levine,* 591 A.2d at 214. The complaint fails to include particularized allegations which would raise a reasonable doubt that the Board's decision to reject the demand

was the product of a valid business judgment.[30]

### IV. Conclusion

Accordingly, the judgment of the Court of Chancery is **AFFIRMED.**

---

**30.** Counsel for defendants conceded at oral argument that there is nothing to bar plaintiff from making another such demand. Whether or not there may be a basis to assert wrongful refusal of any such future demand is not before us.