# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

QUADRANT STRUCTURED PRODUCTS COMPANY, LTD., Individually and Derivatively on behalf of Athilon Capital Corp.,

Plaintiffs,

v.

VINCENT VERTIN, MICHAEL SULLIVAN, PATRICK B. GONZALEZ, BRANDON JUNDT, J. ERIC WAGONER, ATHILON CAPITAL CORP., ATHILON STRUCTURED INVESTMENT ADVISORS LLC, and EBF & ASSOCIATES, LP,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 6990-VCL

## MEMORANDUM OPINION

Date Submitted: October 15, 2014
Date Decided: October 28, 2014

Lisa A. Schmidt, Catherine G. Dearlove, Russell C. Silberglied, Susan M. Hannigan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Harold S. Horwich, Sabin Willett, Samuel R. Rowley, BINGHAM McCUTCHEN LLP, Boston, Massachusetts; *Attorneys for Plaintiff Quadrant Structured Products Company, Ltd.*

Philip A. Rovner, Jonathan A. Choa, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Philippe Z. Selendy, Nicholas F. Joseph, Sean P. Baldwin, QUINN EMANUEL URQUHART & SULLIVAN, LLP; New York, New York; *Attorneys for Defendants Vincent Vertin, Michael Sullivan, Patrick B. Gonzalez, Brandon Jundt, J. Eric Wagoner, Athilon Capital Corp., and Athilon Structured Investment Advisors LLC.*

Collins J. Seitz, Jr., Garrett B. Moritz, Eric D. Selden, SEITZ ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Attorneys for Defendant Merced Capital, L.P., formerly known as EBF & Associates, LP.*

**LASTER, Vice Chancellor.**

Plaintiff Quadrant Structured Products Company, Ltd. ("Quadrant") owns debt securities issued by defendant Athilon Capital Corp. ("Athilon"). Quadrant alleges that Athilon is insolvent, which gives Quadrant standing to sue derivatively. Quadrant contends that the individual defendants, who are members of Athilon's board of directors (the "Board"), have breached their fiduciary duties by seeking in various ways to benefit Athilon's controller, defendant EBF & Associates ("EBF").

Importantly for present purposes, Quadrant contends that the Board has sought to benefit EBF by investing Athilon's assets in riskier securities. EBF owns all of Athilon's equity and junior notes, which Quadrant alleges are currently underwater and would not receive anything in an orderly liquidation. If the risk-on strategy succeeds, the securities that EBF owns will become valuable. If the strategy fails, more senior creditors like Quadrant will suffer the loss. Quadrant contends that because two of the members of the Board are agents of EBF and a third is not independent of EBF, a majority of the five member Board was interested in the decision to favor EBF such that the defendants must prove that the change in investment strategy was entirely fair. This argument presents a case-specific version of the general theory that a director who holds a material amount of common stock, or who wears two hats as a fiduciary for the corporation and for a large common stockholder, faces a conflict of interest when the corporation becomes insolvent. The conflict arises because the class of residual risk bearers expands to include creditors, and the directors must decide between two groups—creditors and stockholders—whose inherently different risk preferences give them inherently different interests, at a time

1

when both groups can claim legitimately to be the proper subject of the director's decisional ministrations.

In an opinion dated October 1, 2014, this court dismissed the challenge to the Board's risk-on business strategy. *Quadrant Structured Prods Co. v. Vertin*, 2014 WL 5099428 (Del. Ch. Oct. 1, 2104) (the "Rule 12(b)(6) Opinion"). The Rule 12(b)(6) Opinion analyzed Quadrant's argument and reviewed pertinent case law, including *Shandler v. DLJ Merchant Banking, Inc.*, 2010 WL 2929654 (Del. Ch. July 26, 2010) (Strine, V.C.); *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006) (Strine, V.C.), *aff'd sub nom. Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007) (TABLE), and *Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772 (Del. Ch. 2004) (Strine, V.C.). These decisions recognized the conflict on which Quadrant grounds its argument. For example, in *Production Resources*, Chief Justice Strine, then a Vice Chancellor, noted that

> [b]ecause creditors have no interest beyond the debts owed to them, they have no incentive (and much to risk) by encouraging business strategies that would risk the payment of the bulk of their claims but provide some hope that the firm's value will increase to the level at which there could be a return for the equity.

863 A.2d at 790 n.57; *see Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *34 n.55 (Del. Ch. Dec. 30, 1991) (describing divergence of interests). Opinions such as *Shandler, Trenwick*, and *Production Resources* nevertheless spoke of the business judgment rule as providing the operative standard of review for decisions made by the board of an insolvent corporation that would help or hurt the firm as a whole. Rule 12(b)(6) Op., 2014 WL 5099428, at *20-25. From these cases, the Rule

2

12(b)(6) Opinion derived the principle that "when directors make decisions that appear rationally designed to increase the value of the firm as a whole, Delaware courts do not speculate about whether those decisions might benefit some residual claimants more than others." *Id.* at *21.

Based on this principle, the Rule 12(b)(6) Opinion held that an allegedly risky shift is not sufficient to elevate the standard of review from the business judgment rule to entire fairness when a plaintiff challenges a business decision that will increase or decrease the value of the entity as a whole, as opposed a decision that transfers value to a particular person or class of security holders. Other than the potentially favorable implications of the risk-on strategy for the junior tranches of the capital stack owned by EBF, Quadrant's complaint did not identify a basis for rebutting the presumptions of the business judgment rule. When evaluated under the business judgment rule, the allegations of the complaint did not raise a reasonably conceivable inference that the Board's decision to take on additional risk was so extreme as to be irrational and suggestive of bad faith. Consequently, the Rule 12(b)(6) Opinion dismissed the risk-on claim.

Quadrant has moved for reconsideration of the dismissal. Rule 59(e) provides that "[a] motion for reargument setting forth briefly and distinctively the grounds therefor may be served and filed within 5 days after the filing of the Court's opinion or the receipt of the Court's decision." Ch. Ct. R. 59(f). The moving party bears the burden of demonstrating that the court "overlooked a decision or principle of law that would have controlling effect" or "misapprehended the law or the facts so that the outcome of the decision would be affected." *Miles, Inc. v. Cookson Am., Inc.*, 677 A.2d 505, 506 (Del.

Ch. 1995) (quoting *Stein v. Orloff*, 1985 WL 21136, at \*2 (Del. Ch. 1985)). A Rule 59(f) motion is "not a mechanism for litigants to relitigate claims already considered by the court." *Fisk Ventures, LLC v. Segal*, 2008 WL 2721743, at \*1 (Del. Ch. July 3, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) (TABLE) (quoting *Am. Legacy Found. v. Lorillard Tobacco Co.*, 895 A.2d 874, 877 (Del. Ch. 2005)).

In its motion for reconsideration, Quadrant argues that the Rule 12(b)(6) Opinion overlooked or misapprehended the implications of restrictions on Athilon's business imposed by Athilon's certificate of incorporation (the "Athilon Charter"). Under the Athilon Charter, Athilon only can engage in the limited business of guaranteeing credit default swaps written by its wholly owned subsidiary, Athilon Asset Acceptance Corp. ("Asset Acceptance"). Since the financial crisis of 2008, that business has no longer been viable. Asset Acceptance has not written any new swaps, and Athilon has not written any new guarantees. At present, Athilon's business consists of two legacy portfolios. On the liability side, Athilon has a portfolio of guarantees for swaps that will continue to earn premiums until the last contracts expire in 2014 or shortly thereafter. On the asset side, Athilon has a portfolio of investments in securities intended to provide funds to pay off any guarantees that come due.

The Athilon Charter requires that Athilon conduct its business in compliance with certain operating guidelines approved by the credit rating agencies (the "Operating Guidelines"). The Operating Guidelines historically restricted Athilon to investing in short-term, low-risk securities, such as U.S. government and agency securities, certain Euro-dollar deposits, bankers' acceptances, commercial paper, repurchase transactions,

4

money market funds, and money market notes with high short-term ratings. In May 2011, as part of implementing its risk-on strategy, the Board sought permission from the rating agencies to amend the Operating Guidelines to loosen the investment restrictions and expand its permitted investments. The rating agencies signed off, recognizing that the amendments would not cause a downgrade in Athilon's already bathic credit rating. The complaint alleges that the Board subsequently took steps to amend the Operating Guidelines to permit Athilon to invest in longer-dated and riskier investments.

Based on these allegations, Quadrant's Rule 59(e) motion makes two arguments. First, Quadrant seeks to distinguish a limited purpose company from a general business corporation. Quadrant argues that

> [t]he question presented in this case is whether the directors of a limited purpose company, whose sole purpose is entirely impossible, may seek unilaterally to expand the Company's purpose to engage in new business activity previously prohibited by its Certificate of Incorporation and to materially increase the risk profile, when doing so would place risk only on the creditors and benefit only the out-of-the-money equity held entirely by the defendants and their affiliates . . . . Plaintiff's claim is, simply, that once there is no operating business, the duty of loyalty to the enterprise itself is breached by permitting interested directors to use their control over the enterprise to deploy its assets for a different purpose, and to convert balance sheet assets to riskier assets for the benefit of the directors and their affiliates . . . .

Dkt. 129 at 3-4.

The Rule 12(b)(6) Opinion did not overlook or misapprehend this aspect of Quadrant's claim. This aspect of Quadrant's motion highlight the difference between (i) a claim for breach of the entity-specific contract that binds the corporation, its decision-makers, and its stockholders, and (ii) a claim that implicates the context-specific fiduciary

5

duties owed by the corporation's decision-makers when exercising their authority. As the

corporate scholar and statesman Adolf A. Berle explained,

> in every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which apply in favor of a cestui que trust to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.

Adolf A. Berle, *Corporate Powers As Powers In Trust*, 44 Harv. L. Rev. 1049, 1049

(1931). Delaware law adheres to the twice-testing principle.[1]

When evaluating corporate action for legal compliance, a court examines whether

the action contravenes the hierarchical components of the entity-specific corporate

contract, comprising (i) the Delaware General Corporation Law, (ii) the corporation's

charter, (iii) its bylaws, and (iv) other entity-specific contractual agreements, such as a

stock option plan, other equity compensation plan, or, as to the parties to it, a stockholder

agreement.[2] If the risk-on business strategy had violated the Athilon Charter, then

---

[1] *Sample v. Morgan*, 914 A.2d 647, 673 (Del. Ch. 2007) (Strine, V.C.) (explaining that corporate acts are "'twice-tested'—once by the law and again by equity."); *accord Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 641 (Del. Ch. 2013) ("Corporate acts are 'twice-tested,' once for statutory compliance and again in equity."); *see Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011) ("A reviewing court's role is to ensure that the corporation complied with the statute and acted in accordance with its fiduciary duties.").

[2] *See Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 940 (Del. Ch. 2013) ("[O]ur Supreme Court has long noted that bylaws, together with the certificate of incorporation and the broader DGCL, form part of a flexible contract between corporations and stockholders."); *accord Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010) ("Corporate charters and bylaws are contracts among a corporation's shareholders . . . ."); *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991) ("[A] corporate charter is both a contract between the State and the

Quadrant would have stated a claim under Professor Berle's legally oriented test.[3] Alternatively, Quadrant might have stated a claim under Professor Berle's equitably oriented test by alleging that the directors caused Athilon to violate the terms of its entity-specific contract by acting in a manner that breached their fiduciary duties.[4]

The problem for Quadrant was and remains the absence of a pled violation of the entity-specific contract. The complaint recognized that the Board had the authority to amend the Operating Guidelines, that the Board exercised its authority to authorize investments involving greater risk, and that the ratings agencies approved the change as

---

corporation, and the corporation and its shareholders."); *Centaur P'rs, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 928 (Del. 1990) ("Corporate charters and by-laws are contracts among the shareholders of a corporation . . . ."); *see also Fed. United Corp. v. Havender*, 11 A.2d 331, 333 (Del. 1940) ("It is elementary that [the Delaware General Corporation Law's] provisions are written into every corporate charter."); *cf. Lawson v. Household Fin. Corp.*, 152 A. 723, 726 (Del. 1930) ("The same rules which govern the construction of statutes, contracts and other written instruments, are made use of in construing the provisions and determining the meaning of charters and grants of corporate powers and privileges.").

[3] *See Grimes v. Donald*, 673 A.2d 1207, 1213 (Del. 1996) (holding complaint stated claim for violating DGCL); *Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *5 (Del. Ch. Aug. 16, 2010) (same); *see also CA, Inc. v. AFSCME Employees Pension Plan*, 953 A.2d 227, 234 (Del. 2008) ("Bylaws, by their very nature, set down rules and procedures that bind a corporation's board and its shareholders."); *Allen v. El Paso Pipeline GP Co.*, 90 A.3d 1097, 1108 (Del. Ch. 2014) ("Boards of directors have no discretion to exceed the intra-entity limitations on their authority. The possession of discretionary authority is a prerequisite for the policy-based deference of the business judgment rule.").

[4] *Cf. In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *21-22 (Del. Ch. July 24, 2014) (explaining that plaintiffs could state a claim that would survive dismissal under Rule 23.1 if the board knowingly violated the terms of an equity compensation plan); *Pfeiffer v. Leedle*, 2013 WL 5988416, at *5 (Del. Ch. Nov. 8, 2013) (same); *London v. Tyrrell*, 2008 WL 2505435, at *6 (Del. Ch. June 24, 2008) (same).

the Operating Guidelines required. The complaint thus established that Athilon's governing documents authorized the risk-on business strategy that Quadrant has challenged and that the Board was acting within the scope of the authority granted to it under Athilon's entity-specific contract when it decided to increase Athilon's risk profile.

Once analysis under the legal test has established that the corporate decision-makers possessed the authority to act, the focus shifts to the equitable test and examines the discretionary exercise of that authority. To determine whether the Board properly exercised the discretionary authority granted to it by the Athilon Charter and Delaware law, the Rule 12(b)(6) Opinion had to evaluate the Board's actions through the lens of a standard of review. As noted, precedents like *Shandler*, *Trenwick*, and *Production Resources* pointed to the business judgment rule as the applicable standard of review. Because the Board had not violated the restrictions imposed by the Athilon Charter, those restrictions were not pertinent to the fiduciary duty analysis and did not provide a basis for elevating the standard of review. The court did not overlook Quadrant's first argument, and it does not provide grounds for reconsideration.

This leads to Quadrant's second argument, which is that the Rule 12(b)(6) Opinion failed to appreciate that the allegations of the complaint were sufficient to support a reasonably conceivable inference of bad faith and rebut the business judgment rule. As the specific allegations supporting an inference of bad faith that the Rule 12(b)(6) Opinion ostensibly failed to consider, Quadrant points to its assertions regarding the risk-on strategy and the amendment of the Operating Guidelines.

8

The Rule 12(b)(6) Opinion considered these allegations, holding that Quadrant could not "rebut the business judgment rule by alleging that the Board has decided to pursue a relatively more risky business strategy to benefit its sole common stockholder, EBF." 2014 WL 5099428, at *25. The business judgment rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[5] When the rule applies and a plaintiff contends that a business decision was made in bad faith, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010). Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty.[6]

---

[5] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). In *Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000), the Delaware Supreme Court overruled seven of its precedents, including *Aronson*, to the extent they reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *Id.* at 253 n.13. *Aronson* and the partially overruled precedents otherwise remain good law.

[6] *See* William T. Allen, Jack B. Jacobs, & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of Van Gorkom and its Progeny as a Standard of Review Problem*, 96 Nw. U. L. Rev. 449, 452 (2002) (defining an irrational decision as "one that is so blatantly imprudent that it is inexplicable, in the sense that no well-motivated and minimally informed person could have made it"); *see also Brehm*, 746 A.2d at 264 ("Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." (footnote omitted)); *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 780-81 (Del. Ch. 1988) ("A court may, however, review

In its motion, Quadrant argues that investing in riskier assets is not rationally designed to increase the value of the firm, even if the riskier assets may yield a higher return. Quadrant offers the elementary observation that "[t]he possibility of a higher return must be discounted for the riskier asset profile and by the costs that will be incurred in continuing the investment function." Dkt. 129 at 6-7. While that is true, it does not mean that investing in riskier assets is not rationally designed to increase the value of the firm. Risk is a double-edged sword, offering the potential for greater return but with an increased possibility of loss. Directors, not courts, are charged with weighing the costs and benefits of risk and making a decision about how much risk the firm should assume. *See In re Citigroup Inc. S'holders Deriv. Litig.*, 964 A.2d 106, 131 (Del. Ch. 2009). Taking on increased risk was one rational business strategy for Athilon. The decision may turn out poorly, or it may increase the value of the entity. The Board's decision to increase the risk profile of Athilon's investment portfolio was not so far beyond the bounds of judgment that it supports an inference of bad faith.

Pointing out that the Board amended the Operating Guidelines to authorize greater risk did not alter the analysis. That step was consistent with and necessary to facilitate the Board's risk-on strategy. It did not add sufficient weight to the allegations to rebut the presumption of good faith conferred by the business judgment rule. The court did not

the substance of a business decision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.") (emphasis in original).

10

misapprehend the allegations Quadrant made in an effort to rebut the business judgment rule, so Quadrant's second argument does not provide grounds for reconsideration either.

Quadrant closes its motion by asking that if the Rule 59(e) motion is denied, then the Rule 12(b)(6) Opinion be modified to specify that the dismissal is without prejudice. Quadrant posits that discovery may uncover evidence which will permit Quadrant to plead a claim sounding in bad faith. Under Rule 15(aaa), the dismissal is with prejudice. The Rule 12(b)(6) Opinion, however, is an interlocutory ruling. *See Siegman v. Columbia Pictures Entm't, Inc.*, 1993 WL 10969, at *3 (Del. Ch. Jan. 15, 1993) ("Prejudgment orders remain interlocutory and can be reconsidered at any time, but efficient disposition of the case demands that each stage of the litigation build on the last, and not afford an opportunity to reargue every previous ruling." (quoting 1B MOORE'S FEDERAL PRACTICE ¶ 0.404[1], at 117–18 (1992)). Subject to the law of the case doctrine, it can be revisited should future developments, including evidence generated by the discovery process, provide a compelling reason for doing so. *See Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994) (Allen, C.) ("Once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears.").

Quadrant has not carried its burden of demonstrating that the court overlooked a principle of law that would have controlling effect or misapprehended the law or the facts so that the outcome of the decision would be affected. The Rule 59(e) motion is denied.